# United States Tax Court

T.C. Memo. 2024-93

J L MINERALS, LLC, BEASLEY TIMBER MANAGEMENT, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 17076-21.                                        Filed October 8, 2024.

———————

L, an LLC organized by two real estate professionals, bought 645 acres of land in rural Georgia in December 2015 for $1.6 million (about $2,481 per acre). Later on the day of acquisition, L contributed 64.7 acres of the property (easement property) to J, another LLC entity that the real estate professionals had organized. The easement property previously had been subject to a ten-year mineral lease that granted a mining company and its successor the right to explore the property and extract a mineral called kaolin, which was abundant in the area. No mining, however, had occurred during the period of the lease.

In January 2016 P, a timber company, purchased a 98% interest in (i) J for $167,837 (about $2,647 per acre) and (ii) L for $3,132,163. J donated, by deed in December 2017, a perpetual conservation easement (constituting a "qualified real property interest" under I.R.C. § 170(h)(1)(A)) on the easement property to H (a "qualified organization" under I.R.C. § 170(h)(1)(B)) for "conservation purposes" under I.R.C. § 170(h)(1)(C). Relying on a professional appraisal, J claimed a charitable contribution deduction of $16,745,000 (about $258,810 per acre) for a

**Served 10/08/24**

[*2] "qualified conservation contribution" under I.R.C. § 170(h) on its tax return.

R examined J's return and issued a notice of final partnership administrative adjustment (FPAA) determining to disallow the charitable contribution deduction. P timely filed a petition in this Court challenging the FPAA.

*Held*: J made a qualified conservation contribution under I.R.C. § 170(h) and attached to its return a qualified appraisal by a qualified appraiser under I.R.C. § 170(f)(11) and Treas. Reg. § 1.170A-13(c)(3).

*Held, further*, the amount of the charitable contribution deduction is $93,690.

*Held, further*, the I.R.C. § 6662(h) gross valuation misstatement penalty is applicable.

————

*David D. Aughtry* and *Jasen D. Hanson*, for petitioner.

*Elizabeth C. Mourges*, *Kimberly B. Tyson*, *Scott A. Hovey*, *Daniel K. McClendon*, *Robert J. Braxton*, and *Alexandra E. Nicholaides*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Judge*: In 2016 petitioner, Beasley Timber Management, LLC (Beasley Timber), paid $167,837 to buy a 98% interest in J L Minerals, LLC (JL Minerals), a limited liability company that owned a single asset, 64.7 acres of land in Wilkinson County, Georgia. This transaction was part of a broader acquisition of timberland totaling 1,116 acres, with Beasley Timber valuing the timber, land, and improvements at $3.3 million, the price it ultimately paid. During discussions, the seller highlighted that the purchase would open the door to many millions of dollars in possible tax deductions through the donation of conservation easements—a vehicle well known to both buyer and seller.

**[*3]** And so it followed. The next year JL Minerals donated a conservation easement on the 64.7-acre property to Heritage Preservation Trust (Heritage). On its 2017 tax return JL Minerals claimed a charitable contribution deduction of $16,745,000 relating to this donation. The Internal Revenue Service (IRS) issued a notice of final partnership administrative adjustment (FPAA), which, among other things, disallowed the deduction and determined penalties.

The parties have rounded up some of the usual suspects in this Court: (1) whether JL Minerals had donative intent; (2) whether the contribution was made "exclusively for conservation purposes," *see* I.R.C. § 170(h)(1)(C), (4), (5)(A);[1] and (3) whether JL Minerals obtained a qualified appraisal by a qualified appraiser, *see* I.R.C. § 170(f)(11)(D) and (E). Although JL Minerals scrapes by each of these requirements, we find that the deduction amount was an outrageous overstatement. Given that the value claimed on JL Minerals's tax return ($16,745,000) exceeded the correct amount ($93,690) by more than 200%, JL Minerals is also liable for the 40% gross misstatement penalty, *see* I.R.C. § 6662(a) and (h).

## FINDINGS OF FACT

The following facts are derived from the pleadings, stipulations of facts with attached exhibits, and the evidence admitted at trial. JL Minerals is a Georgia limited liability company organized on December 23, 2015, and classified as a TEFRA partnership.[2] JL Minerals's principal place of business has been Georgia during all times relevant to this case, including when its petition was filed. Beasley Timber is its tax matters partner with respect to its 2017 taxable year.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary values to the nearest dollar.

[2] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including JL Minerals.

**[*4]** I.      *Overview of the Property at Issue and Georgia Kaolin Industry*

A.      *Location and Topography*

This case revolves around 64.7 acres of undeveloped land in Wilkinson County, Georgia (easement property).   The easement property comprises a 61.65-acre tract and 3.05-acre tract, separated by a large pond.  As of the time of donation, a hunting lodge overlooked the pond.



The easement property is directly off Georgia State Route 112, a rural area of forests and mines with little residential development.  The forested areas comprise mostly mesic hardwood forest, as well as mixed pine/hardwood successional forest, managed pine forest, bottomland hardwood forest, and a pecan orchard.

The easement property has varied topography with a series of deep ravines and steep slopes throughout.  The southern part features the highest elevation at 465 feet above sea level, with the northernmost part the lowest, dropping to 240 feet above sea level.

**[\*5]**   B.   *Georgia Kaolin*

   1.   *Introduction*

The easement property is in a geologic province called the Fall Line, which is known to host significant deposits of kaolin (also referred to as clay).  Kaolin is an alumina-silicate mineral that historically has been used in the production of paper, plastics, rubber, paints, and other products.  Kaolin is one of the most ubiquitous silicate minerals in the world and is mined in many countries including Brazil, the United Kingdom, and Australia.

For more than 100 years, Georgia has been the nation's dominant source of kaolin, accounting for approximately 90% of domestic production.  According to the Washington County, Georgia, website, kaolin deposits in Georgia are "found in a relatively narrow 'belt' along the Fall Line," commonly referred to as the Georgia Clay (or Kaolin) Belt.  *See Kaolin Capital of the World*, https://washingtoncountyga.gov/ 228/Kaolin-Capital-of-the-World (last visited Aug 15, 2024).  The home of the Georgia kaolin industry is Sandersville, Georgia, in the county over (Washington County) from the easement property (Wilkinson County).

The U.S. kaolin industry has faced headwinds since 2000.  Data from the U.S. Geological Survey (USGS) Commodity Summaries show that the amount of kaolin mined dropped from 8.8 million metric tons in 2000 to 5.7 million metric tons in 2016.[3]  Nat'l Mins. Info. Ctr., *Clays Statistics and Information*, Mineral Commodity Summaries, https://www.usgs.gov/centers/national-minerals-information-center/ clays-statistics-and-information (last visited Aug. 15, 2024).  This decline in production stemmed from factors including increased competition from abroad and from other minerals, such as calcium carbonate.

---

[3] We take judicial notice of this decline in domestic production as documented by the USGS, a source relied upon by both parties in various ways and whose accuracy cannot be reasonably challenged.  *See* Fed. R. Evid. 201(b).  To be clear, the USGS measures the amount of kaolin produced by reference to short dry tons of kaolin.  This measure is slightly different from that used in kaolin mining, which refers to wet tons of kaolin.  It takes approximately 1.66 crude wet tons of kaolin to produce one short dry ton of kaolin product.

**[*6]**     2.     *Processing*

The kaolin industry is built around processing raw kaolin into various end products. As of 2017 the industry was dominated by four major processing companies: Imerys Kaolin, Inc. (Imerys), BASF Corp. (BASF), KaMin Performance Minerals (KaMin), and Thiele Kaolin Co. These major companies were joined by a few "minor" processors which tended to focus on lower cost and lower revenue methods.

Kaolin can be processed in a few different ways. Calcined kaolin processing involves processing the raw kaolin with water for refinement and heating in a kiln, i.e., calcining, to remove all crystalline structural water from the product. Hydrous processing also processes using water, but it allows the products to retain their crystalline structural water. Air-float processing is a dry processing that "floats" the kaolin clay from the interburden (referring to waste or spoil within an ore deposit) with no water and no removal of crystalline structural water from the product. Calcined kaolin has historically fetched the highest prices per ton, followed by hydrous and finally air-float.[4]

Not all kaolin is suitable for processing into all end products, however. Kaolin is not homogenous and features differences in important physical and chemical qualities including brightness/color, viscosity, PH level, particle size distribution, and metal levels. The numerous kaolin end products sold by industry participants each require different volumes and types of kaolin meeting precise specifications. As credibly explained by Doral Mills, a former chief geologist at Imerys, "only a very small portion of . . . kaolin meets or exceeds all the specifications and requirements that any particular kaolin company requires. Most of it, its highest and best use is just to hold the earth together."

As of 2017 each of the processors owned its own plants that specialized in manufacturing their respective lines of kaolin end products. The types of kaolin needed by a given plant varied according to the end products generated by that plant.

---

[4] Kaolin could also be processed into proppants, small beads used for oil and gas drilling. The proppant market suffered a severe decline in the 2010s because of changes in the oil and gas industry.

**[*7]**         3.    *Testing, Exploration, and Mining*

The major processors obtained at least 95% of the kaolin that they processed from land that they owned or over which they had a mineral lease giving them a right to mine. A processor's need to obtain kaolin with defined specifications, as required for use at a particular plant, shaped the contours of the kaolin industry.

Each of the four major processors invested in its own testing laboratory to determine whether a particular sample of kaolin met its specifications. Given the importance of determining whether the kaolin met the requirements for one of a given company's end products, none of the processing companies farmed out its testing or relied on outside representations as to quality.

The processing companies and their many predecessors had actively explored land in the Georgia Clay Belt (including Washington and Wilkinson Counties) for decades looking for kaolin meeting their respective specifications. When a processor came across a property with potential, the processor generally would enter into a preliminary drilling agreement or an option agreement with a landowner that would allow the company to conduct exploratory drilling and testing before entering into a long-term lease or purchasing the property. This exploratory drilling would involve prospecting or wildcat drilling with relatively wide spacing (400–800 feet) between drillholes. The samples were then tested to estimate the quantity and quality of the kaolin.

If the testing showed kaolin meeting required specifications that could be used at a particular plant, the processors would open negotiations to lease or buy the property. Before 2017, leases, rather than land purchases, were the norm. When leasing, a processor would pay a royalty rate based on tonnage, with proximity to a particular plant playing an important role in determining the rate.

After securing rights to either lease or purchase, a processor would do further drilling and testing. The processors uniformly used a grid method, the tried-and-true method for evaluating kaolin deposits. Over periods extending as much as five to eight years, the processors would drill with ever-tighter space between drillhole centers, going from 400 feet to 200 down to 100 or even 50 feet. After testing those samples, the processors were able to identify with certainty the types of kaolin on the property (i.e., whether the kaolin met their unique specifications) and estimate the volumes of the various types of usable kaolin.

**[\*8]** As a processor's certainty about the exact specifications of the kaolin on the property grew, the processor would catalog the amounts of the various types in a reserve report. The major companies strove to have at least 15 to 20 years of inventory for each of the types of kaolin required to process their various end products.

Of course, learning about kaolin specifications and volume on a piece of property was only one part of the equation, as the processors had to consider the costs of extracting the kaolin. Generally, the most significant costs were the removal of overburden, i.e., the soil on top of a kaolin deposit, and the hauling of the crude kaolin to a processing plant or a blunging facility (a facility where the processor would turn mined kaolin into a slurry that could be transported to a processing plant by pipeline). Other costs included reclamation costs, fuel surcharges, and royalty rates if the property was leased.

The ratio of overburden to kaolin was a particularly significant factor, although that ratio might not be uniform across a property. The processors did not view the ratio in a void, however, with an understanding that an objective amount of overburden was meaningful. Thus, a 6:1 overburden ratio at 10 feet of depth had a considerably different complexion from a 6:1 ratio at 100 feet of depth, given the costs in moving and storing the overburden. As one industry participant credibly explained, "deeper you go, naturally, the more overburden you have to encounter and the higher your costs."

The location of the property and the hauling distance to plant or blunging sites were also critical cost considerations. Kaolin processors sought land with kaolin meeting certain specifications relatively near plants that could use kaolin with those specifications in the manufacture of end products.

Mr. Mills aptly summarized at trial the proposition facing a kaolin processor:

> [F]irst of all, the kaolin has to meet a set of specific specifications that are required by that particular company to make the product that they're selling to their customers. So obviously, they would have to find kaolin on that property that met or exceeded all those specifications. Then they would have to find a group of holes that joined without manholes in between them where they could mine that whole area. And then that area has to be under

[*9]     acceptable overburden where it doesn't cost more to get the clay than it's worth. And then it's going to be close enough to their plant to justify hauling it. So there's a whole bunch of variables involved. And if it fails any of them, then it's not used.

If the economics permitted, the property would be mined. The needs of the plant again were paramount. Kaolin processors would assess the anticipated requirements of a processing plant over a several-month period and attempt to mine to provide the plant's necessities for volumes of various types of kaolin. The processor would strip overburden from a small portion of the property (generally a three- or five-acre area, referred to as a cut) to access kaolin needed at a particular plant, always testing the quality of the kaolin to ensure that it met the specifications. Economic considerations continued after opening the mine: The processors would continually evaluate as they mined property whether the overburden ratio or depth might make mining unfeasible.

The four major processors focused on various end products, which provided opportunity for collaboration. They occasionally swapped kaolin and allowed other processors to test or buy unwanted clay.

4.     *Contractors*

In addition to the processing companies, several mining contractors played important roles in the kaolin industry, including overburden removal and crude hauling. The most prominent of these contractors was Arcilla Mining & Land Co., LLC (Arcilla), founded in 1992. Arcilla provided assorted services to processors (both the four major companies and assorted minor, primarily air-float processors) including stripping overburden, hauling crude clay, and mining kaolin on their behalf. Arcilla also acted as an independent supplier of kaolin, although the major processors preferred not to buy kaolin from it because of its higher costs.

Arcilla did at times supply the major processors with kaolin. Joe McKenzie, who spent 51 years in the kaolin industry until his retirement from BASF in 2016, credibly testified to the process: "Arcilla does not just mine clay and take it to a customer. They go to a kaolin company, the kaolin company will do drilling, testing, and would make sure there's a clay that they would be willing to have."

**[\*10]** Aside from Arcilla, it was exceedingly rare for kaolin companies to purchase kaolin from individual landowners that opened their own mines.

II.   *Scaly Knob*

A.   *Royce Lawrence*

In January 1995 the easement property was acquired by Royce Lawrence as part of a $500,000 purchase of more than 400 acres from the Anglo-American Clays Corp., a kaolin mining company then in operation.  As relevant here, Mr. Lawrence ultimately assembled 645 total acres (including the easement property), which we will refer to as the Scaly Knob property.

Both before and during Mr. Lawrence's ownership, at least three kaolin companies, as well as Mr. Lawrence himself, conducted exploratory drilling to assess the Scaly Knob property's potential for kaolin mining.  Specifically, contemporaneous logs reflect drilling in 1981, 1995, and 1998.

In 1997 a kaolin company named Englehard Corp. (Englehard), which ultimately became part of BASF, entered into a lease with Mr. Lawrence to mine the portion of the Scaly Knob property that had been drilled in 1995.  After mining of this area ended, Englehard reclaimed this land as the pond that now separates the two tracts of the easement property.  Mr. Lawrence wanted to construct his own private hunting reserve, with a cabin overlooking the reclamation pond.

B.   *Scaly Knob, LLC*

Mr. Lawrence did not live to see his dream come true, sadly passing away.  Twelve of his friends, who shared a passion for the outdoors and wished to commemorate Mr. Lawrence, picked up the torch, forming Scaly Knob, LLC (Club), and buying the Scaly Knob property from Mr. Lawrence's estate in 2001.  The Club members were successful businesspeople, including Mr. Mills, who as Imerys's chief geologist headed the exploration and development department of the largest kaolin company at the time.  The Club planned to use the property primarily for hunting and fishing.

Two years after purchasing the Scaly Knob property, the Club began exploring its kaolin mining potential, turning, inter alia, to Mr. Mills, whose job for most of the 30 years that he worked in the kaolin

**[*11]** industry was "determin[ing] where a mineral may be." As Mr. Mills credibly testified at trial, he "was intimately familiar with the kaolin deposits in the area," knowing "what possibility was there." He knew for example that a kaolin company had "found a deposit of clay [on the Scaly Knob property] and mined it out," while other companies that had drilled the property "found no clay that they wanted to use."

Mr. Mills and his colleagues focused their attention on what would later become the easement property because it sat between two kaolin mines, i.e., Englehard's mine and a mine bordering the property operated by J.M. Huber Corp. (Huber). Mr. Mills believed that there would be limited interest in the easement property from most kaolin companies because "there would have been too much overburden for [a mining company] to consider unless they had the adjoining property."

Given that Englehard had elected to close its mine rather than expand onto the easement property, the Club representatives believed that it would be unlikely to pursue further mining activities. The Club accordingly concentrated on Huber, with Mr. Mills reasoning that "it was highly likely that a small amount of clay would go from the Huber side onto [the Scaly Knob property] side, and it might be possible that Huber could come across the property line and mine that clay and benefit both [the Club] and Huber."

Mr. Mills accordingly approached Huber, explaining his thinking. He also enticed Huber with the prospect that it could recover more kaolin from its own mine if it also had the right to cross over into the Scaly Knob property.

In July 2003 the Club and Huber agreed to a ten-year mineral lease contract over the easement property. The lease was structured to give Huber a three-month "prospecting and option period" that allowed it to conduct exploratory drilling for an up-front payment of $3,000, before exercising the option to lease (or abandoning its right to do so). Under the contract, Huber agreed to pay a royalty rate equal to $1.85 per short wet ton for all the kaolin that they removed from the property plus an annual payment of $20,000. Although Huber conducted extensive drilling of the easement property thereafter, Huber did not proceed to mine it.

In 2008 Huber's Clay Division was acquired and then reconstituted as KaMin. As part of this acquisition, Huber assigned its mineral lease rights over the easement property to KaMin. Like its

[*12] predecessor, KaMin elected not to mine the easement property at any point over the next five years because it did not meet its needs. KaMin chose not to renew the mineral lease when it expired in 2013. The Club did not enter into a mineral lease with any of the other kaolin companies after KaMin's lease expired. Although Mr. Mills obtained Huber's drilling data on behalf of the Club (before he separated), he credibly testified that he "didn't see anything that [he] could take to a kaolin company that would convince them to mine the property."

III.    *New Neighbors Become New Owners*

   A.    *Free-Wil*

   In August 2014 a company named Free-Wil Holdings, LLC (Free-Wil), purchased 470.7 acres directly to the south of the Scaly Knob property for $620,000. Free-Wil was founded as a real estate investment company in 2003 and was owned in equal part by Marion "Butch" R. Freeman, Jr., a certified public accountant, and Craig Wilson, a forester.

   Messrs. Freeman and Wilson expanded their vision to include facilitating the donation of conservation easements in order to generate tax deductions. In addition to using Free-Wil, Messrs. Freeman and Wilson founded another company, CPG Associates, LLC (CPG), to assist on these matters.[5] By 2014 Messrs. Freeman and Wilson had been involved in at least ten conservation easement projects under the auspices of CPG and other entities.

   When Free-Wil purchased the tract south of the Scaly Knob property, Messrs. Freeman and Wilson were aware that the family from which it purchased hosted an active kaolin mine on part of the property that it retained. Later in 2014 Free-Wil contributed the 470.7-acre parcel to Jackson Lake Plantation, LLC (Jackson Lake), another entity set up by Messrs. Freeman and Wilson. Free-Wil held a 98% membership stake in Jackson Lake, with Messrs. Freeman and Wilson each holding a 1% interest.

   B.    *End of the Club*

   Meanwhile the Club was beginning to fray. Several of the original members had left, with Mr. Mills separating under a cloud. They had been replaced by new members with different ideas, including that the Club was a business venture rather than a retreat. Some of the new

---

[5] The acronym "CPG" apparently stood for Conservation Professionals Group.

[*13] members wished to more actively explore kaolin mining on the property, with all of the members well aware of the Huber mineral lease.

By 2015 the Club was rife with disputes on a wide variety of topics. Given the rancor, the Club began to explore a sale of the Scaly Knob property, spurred by certain members' financial and health issues. One member of the Club attempted to buy the Scaly Knob property for $1.7 million, or to force a sale to a kaolin company, which he believed could garner between $2.1 and $2.5 million. Both overtures were rebuffed by the Club.

Having reached an impasse, the Club turned to its new neighbors, Messrs. Freeman and Wilson, to gauge their interest in purchasing the Scaly Knob property. Mr. Freeman conducted due diligence, during which he learned of the Huber mineral lease over the easement property.

During late fall 2015 Messrs. Freeman and Wilson engaged the services of Bill Rivers, an experienced local geologist who had worked in the kaolin industry. As reflected in contemporaneous invoices, Mr. Rivers met with Messrs. Freeman and Wilson on November 17, 2015, to discuss "possible conservation use for Scaly Knob and Jackson Lake." On December 11, 2015, Mr. Wilson and Mr. Rivers visited the Scaly Knob property, observing "[k]aolin still in place at old mine."

Following the examination of the Scaly Knob property, Mr. Rivers contacted representatives from Imerys, KaMin, and BASF for any relevant mining data. The representative from KaMin stated that it was "finished mining the property and is now reclaiming it," while the BASF representative expressed willingness to share data so long as Mr. Rivers provided a letter "stating the conservation purpose and who was involved, and that we did not plan to mine it."

On December 17, 2015, the Club agreed to sell the Scaly Knob property to Jackson Lake for $1.6 million. The Club determined the sale price based on the members' general knowledge of prices per acre in Wilkinson County, with an eye to profit and a fair price.

The sale closed on December 22, 2015, bringing the total acreage under Jackson Lake's control to approximately 1,116 acres (470.7 acres + 645 acres). The next day Messrs. Freeman and Wilson organized JL Minerals, with Free-Wil holding a 98% member interest and Messrs. Freeman and Wilson each holding a 1% interest.

[*14] Later, on December 23, Jackson Lake contributed the 64.7-acre easement property to JL Minerals. At trial Mr. Freeman explained that he and Mr. Wilson took this action in light of "the mineral lease" and "because of the prospect of that being a conservation option."

IV.  *Beasley Timber Enters the Scene*

A.  *Timber Business*

While finalizing the deal with the Club, Messrs. Freeman and Wilson were working to sell all 1,116 acres under their control, with Beasley Timber already in mind as a potential purchaser. Beasley Timber is a very successful family timber company owned by Darrell Beasley and his sister and run by Mr. Beasley and his brother-in-law Zach Johnson. Mr. Johnson was responsible for all timber acquisitions whereas Mr. Beasley oversaw the business operation generally, including approving every purchase made by Mr. Johnson. Under their leadership, Beasley Timber grew to include over 2,000 employees, 50 logging crews, 40 foresters in four states, and five sawmills.

Beasley Timber's operation required a considerable, consistent supply of timber. Beasley Timber purchased a tract almost every day, making approximately 250 buys a year. When determining whether to buy timber, Mr. Johnson would undertake his own inspection of the property, rather than trust seller representations. Primary considerations included logability and accessibility, as they tried to harvest within four to six months.

The company usually purchased rights to log timber for its mills separately from the land, but at times purchased both timber logging rights and land. Beasley Timber currently holds more than 120,000 acres. Through these land purchases, Messrs. Beasley and Johnson were aware that rural land in Wilkinson County, and surrounding counties, went for around $1,200 an acre and never sold for over $50,000 per acre in or before 2017.

Where Beasley Timber purchased land as well as the rights to log timber, they would plant trees to farm and ultimately harvest. This life cycle spanned approximately 25 to 30 years, with thinning approximately once a decade to provide more sunlight and vegetation.

Beasley Timber's need for trees brought them into contact with Messrs. Freeman and Wilson. Mr. Beasley first met Mr. Wilson when working as a logger, with Mr. Wilson as a forestry consultant. Later,

[*15] Messrs. Freeman and Wilson's investment in rural real estate led to a business relationship with Beasley Timber, with timber sales, rather than land sales, occupying the heart.

B.     *Initiation into the Mysteries*

Messrs. Beasley and Johnson learned of conservation easements at the knees of Messrs. Freeman and Wilson. The four men, along with other members of Mr. Beasley's extended family, purchased a 3,000-acre ranch in Colorado in 2003 for hunting and other outdoor activities. Around this time Mr. Freeman heard about state and federal tax benefits of conservation easements from an acquaintance, informing his partners about this strategy. Starting in 2003 or 2004 the four men investigated a conservation easement relating to a coal deposit on the Colorado property. The pursuit came up dry as they did not control the mineral rights under Colorado law, thus dooming any potential for a conservation easement.

The Colorado flirtation was not Beasley Timber's only foray into the world of conservation easements. As one of Beasley Timber's commercial lenders explained at trial, the placement of conservation easements was "part of something that [it] do[es] regularly to land that [it] purchase[s] as part of [its] business."

C.     *Purchase of Jackson Lake and JL Minerals*

After the acquisition of the Scaly Knob property, Mr. Wilson arranged a tour for Mr. Johnson of the Jackson Lake and JL Minerals properties. Mr. Johnson was impressed by both the quality of the timber and its accessibility, a particularly important consideration for logging during the winter months.

The four friends got down to brass tacks. As Mr. Johnson summarized, Messrs. Freeman and Wilson were "trying to get the highest price," while their Beasley Timber counterparts were "trying to buy at the cheapest." Messrs. Freeman and Wilson's asking price was a total of $3.3 million for both properties. On the buyer side, Beasley Timber estimated the timber value alone at $1.6 million. Mr. Beasley estimated the value of the bare land at $1,200 per acre (approximately $1.34 million all told) and the improvements, such as the hunting lodge, at $400,000 to $500,000.

The deal as conceptualized by Mr. Freeman always included a conservation easement component. Specifically, Mr. Freeman provided

**[*16]** a chart suggesting a charitable contribution deduction of $6,456,289, which would result in tax savings of $2,259,701. During the negotiations, both Beasley Timber and Messrs. Freeman and Wilson were aware of the existence of the Huber lease in January 2016, and thus the possibility for kaolin mining on the easement property.

In January 2016 Beasley Timber purchased Free-Wil's 98% share in Jackson Lake and 98% share in JL Minerals for a combined purchase price of $3,300,000. Specifically, Beasley Timber paid $167,837 for the interest in JL Minerals and $3,132,163 for the interest in Jackson Lake. At the time, JL Minerals's sole asset was the 64.7-acre easement property and Jackson Lake's sole asset was the remainder of the 1,116 acres (Jackson Lake property). Both Messrs. Freeman and Wilson retained their respective 1% interests in both entities, although each entered into option contracts giving Beasley Timber the right, but not the obligation, to purchase both of their respective 1% interests in JL Minerals for $15,000 or less.

Beasley Timber used an existing stumpage line of credit with Southeastern Bank to help fund this acquisition. Before agreeing to provide the funding, Southeastern Bank retained an experienced local appraiser, Dan Hester, to appraise the bare land, excluding the timber value. Specifically, the Bank wanted Mr. Hester to determine "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably." Despite knowing that kaolin was very prevalent in the area, Mr. Hester concluded a fair market value of approximately $1.4 million for the more than 1,100-acre property.

V.    *Next Phases*

A.    *Harvesting the Timber*

Beasley Timber's need for logs to fill its mills pushed it to cut almost immediately following its purchases. Just 12 days after closing, Beasley Timber began harvesting timber on the Jackson Lake property. In the first year after acquisition, Beasley Timber's logging crew harvested 49% of the timber on the track equating to $907,000 in value. Beasley Timber did not cut on the easement property, however.

**[\*17]** B.     *Conservation Easement*

1.     *Laying the Groundwork*

Meanwhile, Messrs. Freeman and Wilson's work on a conservation easement continued apace. Mr. Freeman explained that the strategy was to "split the property between 2 entities with [the] intention of executing 2 conservation easements" "[r]ather than hav[ing] one very large easement deduction in a single LLC." Mr. Freeman further noted that "[a]pproximately 64 acres of the subject tract is held in an LLC, 'JL Minerals, LLC' which is the primary area that kaolin is known to exist." Mr. Freeman further speculated that the remainder of the 1,116 acres, i.e., Jackson Lake, could support a highest and best use (for easement valuation purposes) of a conservation community.

During January and February 2016 Mr. Rivers continued his pursuit of drilling data from certain of the major kaolin companies. For example, in January, he wrote to Mr. McKenzie at BASF, explaining that the "owners hope to place this property into conservation and are looking for all the drill data and supporting documents that are available to substantiate the kaolin mineral values for the property." He further noted that the "investors are willing to pay for the information, and it will be used for conservation purposes only." He also discussed with Arcilla using its laboratory to test drilling samples from the property. Throughout February Mr. Rivers also worked on a technical report about the presence of kaolin on the Scaly Knob property.

By the end of February 2016 the working relationship between Messrs. Freeman and Wilson and Mr. Rivers changed, however. In an email to Dale Hayter, the person who would later appraise the easement at issue, Mr. Freeman observed that "Mr. Rivers has never done any consulting work related to a conservation easement." Mr. Freeman continued that he and Mr. Wilson "attempted to convey the goals of our project [but Mr. Rivers's] thought process revolves around commercial mineral market considerations which . . . don't necessarily align with the dynamics of conservation easement considerations." As Mr. Freeman credibly explained at trial, Mr. Rivers believed that the kaolin on the 1,116-acre property could generate approximately $2–4 million in royalty payments. "Accordingly, we feel Mr. Rivers' primary contribution to the project will be to provide estimated mineral (kaolin and otherwise) tonnages and leave the valuation to another skill set."

[*18] According to invoices that Mr. Rivers sent to Mr. Freeman in June, he spent March through May assembling drill data and maps from previous kaolin company drillings of the Scaly Knob property, and, more specifically, the easement property. After consulting with Messrs. Freeman and Wilson, Mr. Rivers "propose[d] 21 [drill] holes [to test for kaolin] based on old drill data." By early June, Mr. Rivers received the Huber drill data for the easement property from KaMin officials, which he then used to prepare maps for drillers.

Although Mr. Rivers had initially considered using Arcilla's laboratory to test core samples from the easement property, in May he ultimately settled on Ginn Mineral Technology (GMT). By late June Mr. Rivers confirmed with Messrs. Freeman and Wilson that "Michael Ginn will be coordinating everything from here out" and that Mr. Rivers "expect[ed] to be involved only in setting drill holes, getting them drilled and getting the drill core to the Ginn Minerals lab from here on out, unless informed otherwise." On June 27, 2016, Mr. Rivers informed Messrs. Freeman and Wilson that he "delivered all of the research data that [he] ha[d] compiled and a copy of the attached preliminary report to Michael Ginn last week." The material provided to Mr. Ginn "included all of the Evans [Clay Co. (now Unimin)] and Kamin drill data, USGS kaolin pricing from 1995-2016, kaolin leases with per-ton pricing, location maps and drill hole maps."

### 2. An Evolving Roster

#### a. Mr. Freeman's Run at Andy Sheppard

As Mr. Rivers's role changed in May and June 2016, Mr. Freeman was on the hunt for an appraiser. In early May he reached out to a Georgia appraiser named Andy Sheppard, who had previous experience with valuing kaolin. Mr. Freeman explained that he was "looking to develop another solid appraisal resource to utilize on an annual basis for CE projects" and provided Mr. Sheppard a list of references for CPG in case Mr. Sheppard "need[ed] to know anything about our business practices." Although the record at trial does not disclose that either Mr. Beasley or Mr. Johnson had previously used CPG in connection with an easement, both of their names were listed on the first page of a 27-name reference list.

After Mr. Sheppard expressed interest in potentially working with CPG, Mr. Freeman sent an email with a list of four 2016 conservation easement projects, including potential easements on JL

[*19] Minerals and Jackson Lake. Regarding JL Minerals, Mr. Freeman wrote that they were "close to having the geologist's conclusions regarding mineral quantities and the clay characteristics," pointing out that, "[u]ntil recently, Kamin had a long-term lease . . . and has been gracious enough to share the info with us." Mr. Freeman further stated that "[t]o minimize confusion going forward, [he] thought it would be helpful to provide a snapshot of the prior easements [they had] completed along with the final diminution amounts so [Mr. Sheppard could] get a sense of what the numbers look like for projects very similar to the 4 pending transactions excepting the mineral considerations." Attached to the email was a list of 12 transactions from 2008 through 2014, as well as four transactions for 2016, including JL Minerals's. Although communications continued with Mr. Sheppard, no agreement was reached by the end of June.

b. *GMT*

i. *2016 work*

Mr. Freeman had better success with GMT, an established mineral process laboratory in Sandersville, with particular expertise and experience in kaolin. GMT was led by Michael Ginn, who had decades of experience in evaluating minerals, and his daughter, Laura Ginn Mason.

In August 2016 GMT submitted an engagement proposal, stating its understanding that Messrs. Freeman and Wilson were "interested in [GMT's] providing a range of services to streamline and successfully complete the mineral based conservation easement." Specifically, GMT proposed to identify and retain (1) a "third party qualified geologist" and (2) a "qualified and certified mineral/real estate appraiser," further agreeing to "assist with the 'independent' duties and function of the geologist and appraiser by providing time and resources relating to mineral exploration and testing, experience relating to mineral applications/markets and general consulting." GMT charged $50,000 for its services.

Later that month, GMT hired Waters Drilling Co., LLC (Waters Drilling), to drill 12 boreholes along the northern and middle portions of the easement property. Eleven of the boreholes produced core samples containing kaolin and one drill hole lost circulation.[6] According to Mr.

---

[6] Loss of circulation occurs when the drill has lost the requisite pressure to bring the core sample to the surface for collection.

[*20] Freeman, the results from the 2016 drilling showed evidence of potential kaolin reserves and overburden within industry norms. Mr. Beasley remembered that the testing "came back very favorable," showing "a lot" of "high quality" kaolin. As he further recalled, "it needed more testing, a full amount of drilling in order to actually be conclusive."

## ii. *Mr. Sheppard Rebuffs GMT's Overtures*

In late September 2016 GMT contacted Mr. Sheppard to revisit his willingness to serve as appraiser to assorted mineral conservation easement projects sponsored by Messrs. Freeman and Wilson. After Mr. Sheppard talked with Mr. Freeman "about the model GMT has successfully used on several Mineral Conservation Easements in past years," Ms. Mason inquired into Mr. Sheppard's interest in becoming a member of a "team for three [conservation easements] for 2016 . . . [with] many scheduled to complete in 2017."

Mr. Sheppard responded by expressing "some concern regarding methodology," as described by Mr. Freeman. Mr. Sheppard sent three documents that "la[id] out the fundamental aspects of valuing properties with known (or assumed) mineral reserves, as well as information which debunks common myths regarding mineral property/valuation." Mr. Sheppard emphasized that the "primary tool for valuing raw land, prior to rezoning and/or prior to obtaining a Surface Mining Permit, is the Sales Comparison Approach." He expressly noted that an "[i]ncome based model is helpful, but ultimately highly subjective without great data." "Given that the conservation easement includes the value of the *real estate*, and not the *business value* associated with operating a quarry, a Royalty Revenue analysis is the only reasonable approach to value the land being donated in the 'before' scenario." He closed with a note of caution, stating: "Trust me, I know the temptation to go with a higher value, . . . but I'm not in the business of getting fined $10k per report for purporting an illogical valuation."

GMT did not reach an agreement with Mr. Sheppard to be part of its team going forward.

## iii. *2017 work*

In May 2017 Mr. Freeman retained GMT to perform exploratory drilling on 27 additional acres of the easement property. GMT agreed to drill approximately nine holes to "give a more accurate depiction of the volume of commercial kaolin and other mineral resources on your

[*21] property," followed by analysis of the core samples. "A key objective of the evaluation is to identify the highest and best use of the potential mineral reserve[s] [for easement valuation purposes]." GMT wrote that it "expect[s] to discover clay on the property and in some cases significant volumes of clay . . . based on adjacent mining and previous drilling records."

GMT again turned to Waters Drilling, tasking them to drill eight additional boreholes in the southern part of the easement property. This drilling was in a part of the easement property different from that drilled the previous year. As such, it did not involve attempting to obtain more precise data on the kaolin deposit previously explored by means of tighter spacing, as is common in the industry. Waters Drilling found kaolin in four of the drillholes, and its drill lost circulation in the other four locations.

iv. *GMT Report*

In October 2017 GMT issued a kaolin and mineral resource evaluation report that presented GMT's findings regarding the quality and quantity of the kaolin on the easement property. Although Waters Drilling had drilled a total of 20 bore holes, the report referred to only 16 holes.

From the holes it did consider, the GMT report concluded an average overburden of 92 feet, a clay strata thickness of 40 feet, and an overburden-to-clay ratio of 2.3:1. The report stated that the drilling moved the easement property "from a potential mineral resource into the defined category of 'Identified Mineral Reserve.'" The report concluded that the easement property contained over 5,304,000 short wet tons of average to excellent quality kaolin clay.

The report further concluded that the amount of kaolin could support mining 150,000 to 250,000 crude wet tons annually for at least 20 years. It then stated that the easement property provided opportunity for the landowner to operate as a "[kaolin] contractor with limited competition from other contractors or the actual kaolin producers." The report explained that a landowner could successfully replicate Arcilla's business model "with experienced contractors and consultants," which would improve earnings over a mineral lease or sale of the property "by $4.00 to $10.00 per wet crude ton." It stated, finally, that a capable landowner could make a significant profit by offering delivered crude clay to a kaolin producer at $14–$22 per ton.

**[\*22]** At no point after the 2016 GMT drilling and testing, the 2017 GMT drilling and testing, or the preparation of the GMT report did a JL Minerals representative contact any kaolin company to gauge interest in the purchase or lease of the property or whether the kaolin on the property was economically mineable.

c.      *Lawyers, Accountants, and Appraiser*

As GMT worked away, JL Minerals (primarily acting through Mr. Freeman) turned to old conservation easement hands to round out its roster of professionals.  In July 2017 JL Minerals secured the services of McRae Smith Peek & Harman (McRae), to review title issues and compliance with requirements to claim a federal tax deduction in connection with a conservation easement donation on the easement property.  McRae had worked with Mr. Freeman and Mr. Hayter on past conservation easement projects.  Another familiar face was Kimberly Skalski, a certified public accountant whose husband's law firm had worked on conservation easements with Mr. Freeman for years.

For its appraiser, JL Minerals picked Mr. Hayter, a Georgia real estate appraiser with whom Mr. Freeman had been talking since February 2016.  From the very start Mr. Freeman explained to Mr. Hayter that "a major consideration for the easement is the value of the kaolin on the property."  In an introductory email Mr. Freeman emphasized that, as part of any engagement, Mr. Hayter would "provide the mineral valuation by working with . . . reputable sources to establish the unit prices and other relevant information needed to establish the mineral values."

In April 2016 Mr. Freeman continued the intermittent discussions with Mr. Hayter, noting that, with respect to JL Minerals, they were "close to having the geologist's conclusions regarding mineral quantities and the clay characteristics."  As was the case with Mr. Sheppard, Mr. Freeman sent Mr. Hayter a "snapshot" of prior easements he had completed to give Mr. Hayter a sense of the expectation for the easement property's valuation.  In addition, Mr. Freeman provided his team's "best unofficial estimates of diminution values for the current projects [including JL Minerals] in advance."

Around this time Mr. Freeman also drew Mr. Hayter's attention to two state court rulings in the condemnation context that valued kaolin land at approximately $71,000 per acre in one case and more than $100,000 per acre in another.  Mr. Freeman noted that Mr. Sheppard

**[*23]** had testified as an expert in kaolin land value and suggested that "[i]t may be of some value to have [Mr. Hayter] plan on consulting with this firm (at [Mr. Freeman's] cost of course) to utilize some of [Mr. Sheppard's] experience in this area."

Despite these early conversations, Mr. Hayter did not formally agree to appraise the easement property until August 2017. In the interim, Messrs. Freeman and Hayter discussed other conservation easement projects including Jackson Lake, Double Creek Plantation, and Fish Trap Cup Retreat.[7]

### 3. *Talks with Loudermilk*

Despite the preparatory work on the conservation easement front, Mr. Freeman and JL Minerals nonetheless kept their ears open to any offers for the properties. In 2017 Mr. Freeman was approached by Robin Loudermilk, a successful Georgia businessman in the real estate field, whose varied holdings spanned high-rise buildings, development of single-family housing in rural Georgia, farmland, and timberland. Mr. Loudermilk owns a property of approximately 7,200 acres in Wilkinson County. Mr. Loudermilk's land serves as a wetlands mitigation bank and borders the easement property and the Jackson Lake property.

Given his knowledge of Georgia real estate, Mr. Loudermilk expected that he might pay $600–$2,400 per acre, the going rate for raw land in Wilkinson County. In their discussions, Mr. Freeman described the kaolin on the property and broached the idea of a conservation easement. Mr. Loudermilk was uncomfortable with the concept, explaining his view that conservation easements "value [property] as to what it could be, not what it is."

In April 2017 Mr. Freeman offered Mr. Loudermilk three options to buy the land: (1) $2.9 million for all 1,116 acres including remaining timber and hard assets, with the sellers retaining mineral rights; (2) $9.4 million to acquire all 1,116 acres, as well as the mineral rights, drilling data, and propriety information with respect to the easement property; and (3) $9.4 million plus future consideration for 1,116 acres including all mineral rights on the entire 1,116-acre tract.

Mr. Loudermilk responded that the parties were "too far apart in [their] valuations to have a serious conversation," as he valued the first

---

[7] On February 15, 2016, Mr. Hayter formally agreed to appraise the Jackson Lake tract for Mr. Freeman.

**[\*24]** option at $1.5 million and the second at $5 million. In concluding the communication, he expressed appreciation for both positions and his "feel[ing] [the parties] may have different motivations."

Mr. Freeman received no other expressions of interest in the properties from potential buyers.

VI.    *Conservation Easement*

In October 2017 JL Minerals agreed to donate a conservation easement over the easement property, as well as $40,000, to Heritage. Heritage agreed to create a baseline documentation report "documenting [the easement] property's natural resources and critical habitat," to draft the conservation easement documents, and to "perpetually administer, monitor, and defend the easement."

On October 31, 2017, Kristina Sorensen issued a baseline documentation report for the easement property, detailing the easement property's natural resources and habitats. In particular, the baseline documentation reflected that 66% of the property constituted mature mesic hardwood forest with another 3% of the property bottomland hardwood forest, both of which had been designated "high priority" habitats by the Georgia Department of Natural Resources in its 2015 State Wildlife Action Plan (2015 SWAP). Although the report noted that the easement property itself contained neither permanent nor intermittent streams, it pointed out that it "lies in an important groundwater recharge area for the Floridan aquifer." The report also noted that Wilkinson County had records of 11 rare or endangered species, although none had been spotted on the property.

On December 21, 2017, JL Minerals donated a conservation easement over the easement property to Heritage, which recorded the deed eight days later. The easement deed identified various purposes, including retaining the easement property in a relatively natural condition, protecting the conservation values of the easement property, "including productive forestry and agricultural resources," and preventing any use that would impair or interfere with the conservation values. The deed defined the term "conservation values" as (1) the protection of relatively natural habitat and (2) the preservation of open space for scenic enjoyment of the public or pursuant to a clearly delineated governmental conservation policy.

In the deed, JL Minerals expressly reserved the right to engage in agriculture and forestry, subject to specified requirements including

**[\*25]** that it be carried out (1) in accordance with state and federal law and best management practices, (2) pursuant to a land management plan with the terms of the conservation easement, and (3) in a manner that does not materially impair or interfere with conservation value. The deed prohibited active commercial forestry and imposed no-cut zones in special natural areas of mesic hardwood and bottomland hardwood, which covered approximately two-thirds of the property. Although the deed allowed borrow pits for specific uses on the easement property, it also prohibited "filling, excavation, dredging, mining, or drilling," "removal of topsoil, sand, gravel, rock, peat, minerals or other materials," and any "change in the topography of the land" except as "is consistent with Treas. Reg. § 1.170A-14(g)(4)" and "necessary for construction and maintenance on the [easement property] of roads, bridges, and culverts."

VII.  *Appraisal Report*

On February 23, 2018, Mr. Hayter completed his appraisal report on the easement property. In preparing his appraisal, Mr. Hayter relied on the GMT report regarding the minerals on the property and the broader kaolin market.

To value the easement itself, Mr. Hayter used the "before and after" method. He first valued the easement property before the granting of the easement and subsequently found the value of the easement property after the granting of the easement. The difference between the values equaled the value of the easement. To determine the "before" and "after" values, Mr. Hayter determined that the highest and best use for the easement property before the easement was twofold: development as a kaolin mine on the 61.65-acre tract and as residential-agricultural on the 3.05-acre tract. In light of this highest and best use, Mr. Hayter determined that the sales comparison approach was inapplicable and turned to the income approach (i.e., a discounted cashflow method), which produced a before value of $16,800,000 for the kaolin mine portion of the property and $8,500 for the other three acres, amounting to a rounded before-easement value of $16,810,000. Having calculated an after-easement value of $65,000, Mr. Hayter concluded that the value of the conservation easement was $16,745,000 ($16,810,000−$65,000).

[*26] VIII.  *Tax Return and IRS Examination*

JL Minerals timely filed its Form 1065, U.S. Return of Partnership Income, for the 2017 tax year.  It claimed a charitable contribution deduction for a conservation easement of $16,745,000.  It also claimed $227,534 for "Other Deductions," which encompassed "Professional Fees," "Appraisals Fees," and "Mineral Assessment Fees."

The IRS selected JL Minerals's 2017 return for examination.  On or about May 19, 2021, the IRS issued an FPAA that disallowed $16,745,000 of the claimed charitable contribution deduction (the portion attributable to the easement), determining that JL Minerals had not established that it made a contribution or gift in 2017 and had otherwise failed to show that all requirements of section 170 had been met.  The FPAA also disallowed $227,534 in claimed "Other Deductions," explaining that JL Minerals had failed to show that this amount was deductible under the Code.  As to the charitable contribution deduction, the IRS determined a 40% accuracy-related penalty under section 6662(e) and (h) (applicable in the case of a "gross valuation misstatement") and (in the alternative) a 20% penalty under other provisions of section 6662.[8]  The IRS also determined a 20% accuracy-related penalty on the underpayment of tax resulting from the "Other Deductions" adjustment under section 6662(c) and (d).

OPINION

I.  *Burden of Proof*

Generally, the IRS's adjustments in an FPAA are presumed correct, and the taxpayer bears the burden of proving them wrong.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013).  The taxpayer also bears the burden of proving entitlement to any deductions claimed.  *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions.  To trigger such a shift, a taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," I.R.C.

---

[8] We previously have held that the IRS secured timely supervisory approval to assert each of these penalties, while granting Beasley Timber's motion for partial summary judgment as to the reportable transaction penalty.

[*27] § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," I.R.C. § 7491(a)(2)(A).[9]

The resolution of the issues in this case does not depend on which party has the burden of proof. When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. We do not perceive an evidentiary tie in this case and are able to resolve the issues on the preponderance of the evidence. *See id.*; *Schank v. Commissioner*, T.C. Memo. 2015-235, at *16.[10]

II.    *Section 170 Qualified Conservation Contributions*

Section 170(a) allows the deduction of a charitable contribution made within a taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(c)(1).

As a general rule, no deduction is allowed for a contribution of less than a donor's entire interest in property. I.R.C. § 170(f)(3)(A). Section 170(f)(3)(B)(iii) excepts from this broad prohibition a deduction for a contribution of a partial interest in property that constitutes a "qualified conservation contribution." This exception applies where (1) the taxpayer makes a donation of a "qualified real property interest," (2) to a "qualified organization," and (3) the donation is "exclusively for conservation purposes." I.R.C. § 170(h)(1).

The Commissioner asserts that JL Minerals's charitable contribution does not count as a "qualified conservation contribution" for four reasons. He first contends that JL Minerals lacked the requisite donative intent to make a charitable contribution. The Commissioner's remaining arguments sound in various prerequisites established by the

_____

[9] Section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability *of any individual* for any penalty, addition to tax, or additional amount." (Emphasis added.) This provision does not apply to TEFRA partnership-level proceedings (such as this case). *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Thus, in a TEFRA partnership case the petitioner has not only the burden of proof but also the burden of production, even as to any penalty. *Id.*

[10] Consequently, Beasley Timber's motion to shift the burden of proof, filed on February 21, 2023, is denied as moot.

[*28] Code for a donation to be "exclusively for conservation purposes." He asserts that the conservation easement fails to satisfy any conservation purpose outlined by the Code. *See* I.R.C. § 170(h)(4). The Commissioner next argues that the easement fails to protect any conservation purpose in perpetuity. *See* I.R.C. § 170(h)(5)(A). He finally challenges the easement's explicit permission for borrow pits in light of the Code's prohibition of surface mining. *See* I.R.C. § 170(h)(5)(B). We reject each of these contentions.

## A. *Donative Intent*

The Commissioner argues that JL Minerals lacked donative intent because it was primarily motivated to monetize the federal income tax deduction for Beasley Timber and its partners, Messrs. Freeman and Wilson. The Commissioner's challenge is unfounded:

> [A] donor motivated by guilt, or by the hope of being admired, or by the desire for a tax benefit, may still deduct his contribution. Congress long ago decided to incentivize charitable contributions by allowing a deduction for those contributions, and it would be perverse indeed to deny a deduction to a donor simply because he had responded to the incentive.

*Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *28; *see also Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at *42–43; *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *37–38, *supplemented by* T.C. Memo. 2024-73.

Nor does our "quid pro quo" precedent rescue the Commissioner. "If a transaction with a charity 'is structured as a *quid pro quo* exchange'—i.e., if the taxpayer receives property or services equal in value to what he conveyed—there is no 'contribution or gift' within the meaning of the statute." *Oconee Landing*, T.C. Memo. 2024-25, at *37 (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989)). The quid received here consisted of a huge tax deduction, which was provided by the Department of the Treasury, not Heritage. As we have explained before, we have seen "no case in which the tax benefits associated with a charitable contribution deduction have been deemed a 'quid pro quo' that negates the donor's charitable intent." *Buckelew Farm*, T.C. Memo. 2024-52, at *43; *see also Oconee Landing*, T.C. Memo. 2024-25, at *38.

[*29]   B.    *Exclusively for Conservation Purposes*

  1.    *Conservation Purpose*

Section 170(h)(4)(A) defines the term "conservation purpose" to mean, inter alia, "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem," or "the preservation of open space . . . where such preservation is . . . pursuant to a clearly delineated Federal, State, or local governmental conservation policy, [that] will yield a significant public benefit."  I.R.C. § 170(h)(4)(A)(ii) and (iii). "Under the statute, each of these . . . prongs is a conservation purpose in and of itself, and a taxpayer's satisfaction of one of these prongs suffices to establish the requisite conservation purpose." *Murphy v. Commissioner*, T.C. Memo. 2023-72, at *39 (quoting *Herman v. Commissioner*, T.C. Memo. 2009-205, 2009 WL 2923945, at *6).

We begin by identifying the conservation purposes specified in the deed. *Id.* at *42 ("We consider only a conservation purpose that is stated in the deed.").  The deed includes a paragraph entitled "Purpose," which states:

> It is the exclusive purpose of the Conservation Easement to assure that the Property will be retained forever in its predominantly relatively natural, forested, open space, and relatively undeveloped condition, and to preserve and protect the Conservation Values of the Property, including . . . a variety of significant natural habitats, and to prevent any use of the Property that will impair or interfere with the Conservation Values of the Property (collectively, the ["]Purposes").

The deed further provides that the right "[t]o preserve and protect the Conservation Values" was conveyed to Heritage "[t]o accomplish the Purpose of this Conservation Easement."

The term "Conservation Values" is defined in a recital that provides that "the Property in its present state has not been developed and possesses significant open space, forested, agricultural, watershed, wildlife, and habitat features (collectively, the 'Conservation Values')." The deed continues that "[i]n particular, said Conservation Values include:" "1. [p]rotection of [r]elatively [n]atural [h]abitat," specifically bottomland hardwood forest and mesic hardwood forest, and "2. [p]reservation of [o]pen [s]pace (including farmland and forest land) for [s]cenic [e]njoyment of the [p]ublic or pursuant to a clearly delineated

**[*30]** governmental conservation policy." As scenic enjoyment, the deed points to the 265 feet that forms the easement property's southern border; for government conservation policy, the deed references "Prime Farmland Soils and Soils of Statewide Importance, as defined by the U.S. Department of Agriculture and Natural Resource Conservation Services," and protection of the Lower Oconee River Watershed as designated in the 2005 Georgia Comprehensive Wildlife Conservation Strategy.

Stitching these provisions together, the deed incorporates the definition of Conservation Values set forth in the recital as part of its defined Purpose. The purpose thus includes "to preserve and protect conservation values," i.e., (1) relatively natural habitat, (2) open space for scenic enjoyment, and (3) open space for protection of certain soils defined by the Department of Agriculture or the Lower Oconee River Watershed pursuant to the 2005 Georgia Comprehensive Wildlife Conservation Strategy. Although Beasley Timber attempts to rely on the 2015 SWAP as a delineated government policy, the deed does not support this assertion. The deed enumerates as part of its conservation values preservation of open space in service of two specific government policies and plainly does not include the 2015 SWAP. What the deed has not expressed, we will not consider. *See Murphy*, T.C. Memo. 2023-72, at *45.[11]

Having identified the universe of potential conservation purposes, we consider whether the easement protects any of these purposes. Our analysis starts and ends with the preservation of "a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem" pursuant to section 170(h)(4)(A)(ii).

As the U.S. Court of Appeals for the Eleventh Circuit, to which an appeal in this case would ordinarily lie, *see* I.R.C. § 7482(b)(1), has recognized, the Department of the Treasury has issued a regulation on this point that "makes more explicit what one might reasonably construe the Code to mean anyway," *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d 1033, 1036 (11th Cir. 2020), *vacating and remanding* T.C. Memo. 2018-146. Specifically, Treasury Regulation

---

[11] Of course, had the deed included preservation of open space pursuant to the 2015 SWAP as a conservation value, Heritage would have the right to preserve and protect open space pursuant to the 2015 SWAP. *See Murphy*, T.C. Memo. 2023-72, at *46. As we concluded in *Murphy*, we find it difficult to believe that a court would sustain an objection by Heritage based on the 2015 SWAP without any explicit statement designating it as a conservation value. *See id.*

[*31] § 1.170A-14(d)(3)(i) provides that the habitat being preserved must be a "significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives."

"Requiring some level of significance . . . is unobjectionable." *Champions Retreat Golf Founders, LLC v. Commissioner*, 949 F.3d at 1036. "[E]ven without the regulation, the Code would not be construed to apply to a completely trivial habitat—a few commonly occurring ants plainly would not do, nor would many other species not in need of conservation." *Id.* To sum up, the Eleventh Circuit in *Champions Retreat* "construes the regulation to connote 'some level of significance' that is not 'trivial.'" *Mill Road*, T.C. Memo. 2023-129, at *34.

Beasley Timber argues that the concept of "significant relatively natural habitat" as described in the regulation conflicts with the plain statutory text. Since Beasley Timber turned in its brief, there has been a sea change in the framework governing how courts interpret the relationship between statutes and regulations. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). We are not called upon to determine the fallout in this case, however, because the easement here satisfies the section 170(h)(4)(A)(ii) requirement of a "relatively natural habitat" even assuming arguendo that the Code requires a "level of significance that is not trivial."

We begin with a quick review of the rest of the key wording. A habitat is "'[t]he area or environment where an organism or ecological community normally lives or occurs' or '[t]he place where a person or thing is most likely to be found.'" *Glass v. Commissioner*, 124 T.C. 258, 281–82 (2005) (quoting *American Heritage Dictionary of the English Language* (4th ed. 2000)), *aff'd*, 471 F.3d 698 (6th Cir. 2006). In distinguishing "relatively natural" from the unadorned "natural" we have looked to Treasury Regulation § 1.170A-14(d)(3), which notes that the "fact that the habitat or environment has been altered to some extent by human activity will not result in a deduction being denied under this section if the fish, wildlife, or plants continue to exist there in a relatively natural state." *See, e.g.*, *Murphy*, T.C. Memo. 2023-72, at *50 ("'[N]atural' does not necessarily mean untouched by human hands and feet but can refer to areas somewhat altered by human activity; and 'relatively natural' refers to areas that may be even more altered but still retain conservation value . . . .").

The JL Minerals easement protects significant relatively natural habitats. We first consider whether the property contains a relatively

**[\*32]** natural habitat. The baseline documentation report identifies two habitats in particular, stating that 69% of the easement property is covered with either mature mesic hardwood forest or bottomland hardwood forest, with the remainder mixed between managed pine and succession forest. The Commissioner's expert agrees with the baseline documentation report's conclusion that such habitats exist and does not suggest that these habitats were anything but relatively natural. Although the Commissioner observes that there is no water on or running through the property, he fails to show that water on the property is a necessary prerequisite for these habitats.

As to significance, the State of Georgia has designated both of these types of forest high priority habitats in its 2015 SWAP. The 2015 SWAP identifies high priority habitats based on the rarity of the habitat as well as on whether the habitat supports species in need of conservation. The Georgia Department of Natural Resources website defines "high-priority habitats" as "natural habitats that rank highest for recommended research or other conservation-related matters. For some, it may be because of their rarity; for others, it may be because little is known about them or because they face daunting threats, such as habitat loss or fragmentation." *State Wildlife Action Plan*, Ga. Dep't of Nat. Res., https://georgiawildlife.com/WildlifeActionPlan (last visited July 19, 2024). The Commissioner responds that Beasley Timber fails to explain how the mesic and bottomland hardwood habitat on the easement property fits within the definitions of the 2015 SWAP. The baseline documentation report explicitly linked the two, and the Commissioner offers nothing besides conjecture to suggest that the baseline documentation report is wrong.

The Commissioner also questions the significance of the habitats on the property because they do not fit within any of the examples in the regulation of significant natural habitats and ecosystems. As we have explained before, Treasury Regulation § 1.170A-14(d)(3)(ii) contains a nonexhaustive list, which generally "distinguish[es] species that reasonably warrant protection, on the one hand, from commonly occurring species for which the loss of habitat is not of significant concern." *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1036. We believe that Georgia's designation of mesic and bottomland hardwood forests as high priority habitats shows "'some level of significance' that is not 'trivial.'" *Mill Road*, T.C. Memo. 2023-129, at \*34 (quoting *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d at 1036).

**[*33]** The Commissioner finally points to the small size of the easement as evidence that it lacks conservation value. The easement property is 64.7 acres (.10 square mile), and the land designated as "Special Natural Areas" by the easement deed represent roughly two-thirds of the easement property (.07 square mile), which the Commissioner alleges is "too small to provide a significant relatively natural habitat." The Commissioner seeks to import a size requirement that the Code does not impose. *See Glass v. Commissioner*, 471 F.3d at 711 ("[A]s the Commissioner concedes, there is no provision in I.R.C. § 170(h) or the implementing regulations that requires a minimum size for a qualifying conservation contribution.").

"Under the plain meaning of section 170(h)(4)(A)(ii), all that is required is that the easement protect 'a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem'." *Mill Road*, T.C. Memo. 2023-129, at *34. The easement property "protects plant communities and ecosystems natural to [Wilkinson] County, which will continue to exist in a relatively natural state" no matter whether any development occurs around it. *Id*. The easement deed thus satisfies the conservation purpose requirement of section 170(h)(4)(A)(ii).[12]

### 2.    *Protected In Perpetuity*

Section 170(h)(5)(A) provides that a contribution will not be treated as being made exclusively for conservation purposes "unless the conservation purpose is protected in perpetuity." Given that a qualified conservation contribution encompasses donations of less than a donor's full interest in property, *see* I.R.C. § 170(f)(3)(A), (B)(iii), (h)(2)(C), we consider this requirement taking into account rights reserved by the donor. The Treasury regulations have pondered the same point and identified three permutations, which we have summarized before:

> Altogether, these regulations provide that a donor (1) may reserve in the easement deed rights to make continued use of the easement property, provided that there are enforceable restrictions to prevent uses

---

[12] Given our conclusion that the deed satisfies the conservation purpose requirement by protecting the relatively natural mesic hardwood forest and bottomland hardwood forest habitats under section 170(h)(4)(A)(ii), we need not reach the parties' wide variety of other arguments relating to this requirement, including whether a potential habitat for rare, threatened, or endangered species counts as significant, arguments regarding section 170(h)(4)(A)(ii), and the procedural validity of various regulations under the Administrative Procedure Act.

**[\*34]** inconsistent with conservation purposes, (2) may continue pre-existing use of the easement property that does not conflict with the conservation purposes of the gift, and (3) cannot use the property in such a way that would destroy other significant conservation interests (unless pursuant to protecting the conservation purpose of the easement).

*Murphy*, T.C. Memo. 2023-72, at \*61; *see also Mill Road*, T.C. Memo. 2023-129, at \*39; Treas. Reg. § 1.170A-14(b)(2), (e)(2) and (3), (g)(1).

The rights reserved in the easement deed do not contravene the protection of its conservation purpose (i.e., the preservation of mesic and bottomland hardwood forests) in perpetuity. Although the Commissioner asserts that the unfettered exercise of the reserved rights could have negative effects on conservation writ large, he misses the forest for the trees. Each of the reserved rights but one[13] contains linguistic variations on a common theme: The respective right is allowed so long as it does "not materially impair or interfere with the Conservation Values," or, to put it positively, "preserve[s] the Conservation Values." The deed further equips Heritage with the right to require compliance with the deed's purpose—to preserve and protect the Conservation Values—by "bring[ing] an action at law or in equity . . . to enforce the terms of this Conservation Easement." *See Mill Road*, T.C. Memo. 2023-129, at \*40. The reserved rights are married to enforceable restrictions to prevent uses inconsistent with conservation purpose, and the deed thus passes muster under the "protected in perpetuity" requirement of the Code and the regulations.

### 3. *Retention of a Qualified Mineral Interest Under Section 170(h)(5)(B)*

Section 170(h)(5)(B) provides, as a general matter, that the "protected in perpetuity" requirement is not met "in the case of a contribution of any interest where there is a retention of a qualified mineral interest . . . if at any time there may be extraction or removal of minerals by any surface mining method." The Code defines a qualified mineral interest as "subsurface oil, gas, or other minerals, and . . . the

---

[13] The easement deed does not reference conservation values or purpose with respect to JL Minerals's reservation of the "right to take action reasonably necessary to prevent erosion on the [easement property] or to protect public health and safety." The Commissioner nonetheless does not object to this reservation of rights or suggest how it might threaten the perpetual protection of the conservation purpose.

**[\*35]** right to access such minerals." I.R.C. § 170(h)(6); *see also* Treas. Reg. § 1.170A-14(b)(1)(i). Treasury Regulation § 1.170A-14(g)(4) observes in this regard that "a deduction under this section will not be denied in the case of certain methods of mining that may have limited, localized impact on the real property but that are not irremediably destructive of significant conservation interests."

The deed contains two pertinent provisions. It first specifies:

> There shall be no filling, excavation, dredging, mining or drilling, no removal of topsoil, sand, gravel, rock, peat minerals, or other materials, and no change in the topography of the land in any manner except as is consistent with Treas. Reg. § 1.170A-14(g)(4) and as necessary for construction and maintenance on [the easement property] of roads, bridges, and culverts.

The deed later grants the "right to have borrow pits not to exceed a total of 1 acre, to provide required fill material for use, such as repairing roads, solely and exclusively on the" easement property.[14]

The Commissioner argues that the "borrow pit" carveout is a violation of section 170(h)(5)(B) because it necessarily involves the removal of material containing minerals using a surface mining method. The Commissioner's own regulation, which allows "certain methods of mining that may have limited, localized impact on the real property but that are not irremediably destructive of significant conservation interests," belies this sophistry. Treas. Reg. § 1.170A-14(g)(4). The deed allows for digging up a limited amount of dirt to repair roads solely on the property, which plainly fits in the permissible kind of localized low-impact disturbance.[15]

### III. *Qualified Appraisal Requirements*

Section 170(f)(11)(D) generally provides that a charitable contribution deduction claim exceeding $500,000 must be accompanied by, inter alia, a qualified appraisal by a qualified appraiser. The Code

---

[14] A borrow pit is "an area where material (usually soil, gravel or sand) is dug for use at another location. The term is literal—meaning a pit from where material is borrowed." *Mactec, Inc. v. Bechtel Jacobs Co., LLC.*, 346 F. App'x 59, 69 (6th Cir. 2009).

[15] Although we need not go further, we observe in passing that one of the Commissioner's own experts distinguished digging material for a borrow pit from mining, which is consistent with our view of the regulation.

**[\*36]** defines both terms. A "qualified appraisal" is one that (1) meets requirements set forth by "regulations or other guidance prescribed by the Secretary" and (2) "is conducted by a qualified appraiser *in accordance with generally accepted appraisal standards* and any regulations or other guidance prescribed." I.R.C. § 170(f)(11)(E)(i) (emphasis added). The term "qualified appraiser" means an individual who, as relevant here, "meets . . . requirements as may be prescribed by the Secretary in regulations or other guidance." I.R.C. § 170(f)(11)(E)(ii)(III). The Commissioner asserts that JL Minerals failed to obtain a qualified appraisal or to retain a qualified appraiser.

## A. *Generally Accepted Appraisal Standards*

In response to the statutory incorporation of the requirements of regulations or guidance into the definition of the term "qualified appraisal," the IRS issued I.R.S. Notice 2006-96, 2006-2 C.B. 902 (2006 Notice). As most relevant here, the 2006 Notice explained that an appraisal is "qualified" if it is consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice (USPAP).[16] *See* 2006 Notice § 3.02(2).

The parties before us joust over the appraisal's compliance with USPAP. In particular, the Commissioner asserts that the appraisal reflected preordained results, displayed overreliance on the GMT report, inappropriately preferred the income method to the comparable-sales method for valuing the property, and overall was not credible. He claims that these defects cause the appraisal to dip below the minimum USPAP.

As we have noted before, "[a]ppraising is not an exact science and has a subjective nature." *Gorra v. Commissioner*, T.C. Memo. 2013-254,

---

[16] Effective January 1, 2019, Treasury Regulation § 1.170A-17(a)(2) defines "generally accepted appraisal standards" for purposes of I.R.C. § 170(f)(11)(e) to mean "the substance and principles" of USPAP. In adopting this standard, the Department of the Treasury observed: "The Treasury Department and the IRS agree that it is beneficial to provide some flexibility by requiring conformity with appraisal standards that are consistent with the substance and principles of USPAP rather than requiring that all appraisals be prepared strictly in accordance with USPAP." Substantiation and Reporting Requirements for Cash and Noncash Charitable Contribution Deductions, 83 Fed. Reg. 36417-01, 36420 (July 30, 2018) (to be codified at 26 C.F.R. pts 1, 602). Although the tax year at issue precedes the effective date of this regulation, it nonetheless provides that "[t]axpayers may rely on the rules of this section for appraisals prepared for returns or submissions filed after August 17, 2006." Treas. Reg. § 1.170A-17(c).

**[\*37]** at \*48.  The Commissioner attacks Mr. Hayter primarily for overreliance on GMT, from which most of his other purported errors flow, from the Commissioner's point of view.  Mr. Hayter, however, disclosed his heavy reliance on GMT from the start of his report and included as an extraordinary assumption that the GMT information was accurate.  The Commissioner further critiques Mr. Hayter's selected appraisal methodology (the use of the income approach) and his failure to sufficiently reconcile the extraordinary results in the GMT report using the comparable sales method.  We are not convinced that Mr. Hayter's work is inconsistent with the substance and principles of USPAP.  Although the Commissioner has identified significant weaknesses in the appraisal, any failures to comply with USPAP "go more to the credibility and weight of the appraisal and not to whether the appraisal complies with generally accepted appraisal standards." *Buckelew Farm*, T.C. Memo. 2024-52, at \*49; *see also Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse I*), 131 T.C. 112, 127–28 (2008), *vacated and remanded, Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse II*), 615 F.3d 321 (5th Cir. 2010); T.D. 9836, 2018-33 I.R.B. 291, 294  ("[T]he final regulations do not adopt the recommendation to require strict compliance with USPAP and retain the requirement of consistency with the substance and principles of USPAP.").

B.  *Qualified Appraiser*

The Code's definition of a qualified appraiser, another necessary element of a qualified appraisal, incorporates "requirements as may be prescribed by the Secretary in regulations or other guidance."  *See* I.R.C. § 170(f)(11)(E)(ii).  Again, we look to the 2006 Notice, which states that "[t]he requirements of [Treasury Regulation] § 1.170A-13(c) . . . concerning qualified appraisals and qualified appraisers continue to apply to all taxpayers."  2006 Notice § 3.04(1), 2006-2 C.B. at 903.

As relevant here, Treasury Regulation § 1.170A-13(c)(5)(ii) provides that an appraiser is not qualified if "the donor [here, JL Minerals] had knowledge of facts that would cause a reasonable person to expect the appraiser [here, Mr. Hayter] falsely to overstate the value of the donated property."

> [I]t is not the appraisal that may become disqualified, but rather the appraiser. . . .  [T]he appraiser does *not* become disqualified simply because (1) the appraiser incompetently or carelessly overstated the value, and/or (2) the donor knew that the appraiser overstated the value,

**[*38]** and/or (3) the donor knew facts *about the property* that caused the value to be overstated. Rather, this disqualification occurs when the donor knows facts that do or should cause him to expect the appraiser to falsely overstate the value. Such facts will be facts about the appraiser, and the resulting expectation is not just an incorrect overstated value but a "falsely" overstated value.

*Mill Road*, T.C. Memo. 2023-129, at *42; *see also Oconee Landing*, T.C. Memo. 2024-25, at *39 ("The 'knowledge' requirement in Treasury Regulation § 1.170A-13(c)(5)(ii) implicates the donor's actual and/or constructive knowledge."). The Treasury regulation provides an example sounding in collusion to illustrate this knowledge requirement: "[T]he donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property . . . ." Treas. Reg. § 1.170A-13(c)(5)(ii).

"In gauging a partnership's 'knowledge' for this purpose, we look to the knowledge of the person(s) with ultimate authority to manage the partnership." *Oconee Landing*, T.C. Memo. 2024-25, at *40; *see also Buckelew Farm*, T.C. Memo. 2024-52, at *45. Although Messrs. Freeman and Wilson took an active role in the business dealings of JL Minerals, including coordinating the conservation easement, ultimate authority over JL Minerals rested with Messrs. Johnson and Beasley. Even assuming arguendo that Messrs. Freeman and Wilson's extensive work for a 1% ownership stake each in JL Minerals put their much greater knowledge at issue, we conclude that a reasonable person would not expect Mr. Hayter to falsely overstate the property's value even considering the full facts before Messrs. Freeman and Wilson.

To be clear, the Commissioner's case is not insubstantial. Summarizing the brief, Mr. Freeman picked a compliant appraiser (willing to tweak his numbers to please a client) and pointed him as to the questionable method to be employed and as to the general values that he desired. And Mr. Freeman knew that a false overstatement would result, given the repeated warnings of Mr. Sheppard about the use of the income method as a means of manipulation.

These facts also can be read as a relatively normal back-and-forth between client and appraiser. The client first retains someone who has experience and skill with mineral valuations, and then gives samples of what the client has found appropriate in the past. So far, so good. The

**[\*39]** client trusts the appraiser to pick an acceptable method and believes that the income method makes sense given the uniqueness of the property. And the appraiser, although responsive to feedback, explicitly aims to stay within the bounds of reasonableness.

On the record before us, we do not conclude that a reasonable person with Mr. Freeman's knowledge would expect Mr. Hayter to falsely overstate the value nor that there was a meeting of the minds on a predetermined result. This case presents a markedly different situation from *Oconee Landing*, T.C. Memo. 2024-25, at \*45, where the donor intimately understood the fair market value of the property and reached an implicit agreement with the appraiser as to a value that he knew to be false. We thus conclude Mr. Hayter is a qualified appraiser within the meaning of section 170(f)(11)(E).[17]

IV.  *Valuation*

A.   *General Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property other than money is the "fair market value" of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." "This definition, a fixture in the Treasury Regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property." *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*27; *see also Value*, *Black's Law Dictionary* (4th ed. 1968) (defining "'value' of land for purpose of taxation" as the "price that would probably be paid therefor after fair negotiations between willing seller and buyer"); Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 3 (1971) (defining fair market value as "the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obliged to buy").

---

[17] Given our finding that JL Minerals complied with the substantiation requirements set forth in section 170, it is unnecessary to address the Commissioner's argument that the failure to comply was due to willful neglect.

[*40] The value of a property on a certain date is a question of fact to be resolved on the basis of the entire record, *see, e.g.*, *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965), and the parties retained experts to assist in our inquiry. We evaluate their opinions in light of each expert's qualifications and the evidence in the record, and we may accept an "opinion in toto or accept aspects . . . that we find reliable." *Oconee Landing*, T.C. Memo. 2024-25, at *58; *see also Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *35. We also "may determine fair market value on the basis of our own examination of the evidence in the record." *Savannah Shoals*, T.C. Memo. 2024-35, at *35; *see Buckelew Farm*, T.C. Memo. 2024-52, at *51.

As there is no substantial record of comparable sales of easements comparable to the JL Minerals easement, the parties agree that the easement should be valued by calculating the difference between the fair market value of the easement property before and after JL Minerals granted the easement. *See, e.g.*, *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 2012 WL 371809, at *7, *aff'd*, 744 F.3d 648 (10th Cir. 2014); Treas. Reg. § 1.170A-14(h)(3)(i). In deciding the "before value," we must take into account not only the actual use of the easement property when the easement was given in December 2017, but also its highest and best use. *See Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(ii). Although this "concept 'is an element in the determination of fair market value, . . . it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value.'" *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *47 (quoting *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)); *see also Corning Place*, T.C. Memo. 2024-72, at *41.

B.    *Highest and Best Use*

1.    *Legal Grounding*

"To determine a property's highest and best reasonably probable use, the court focuses on '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 996 (11th Cir. 2016) (quoting *Symington v. Commissioner*, 87 T.C. 892, 897 (1986)), *aff'g in part, rev'g and remanding in part* T.C. Memo. 2014-79; *accord Olson v. United States*, 292 U.S. 246, 255 (1934). We have defined highest and best use as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically

[*41] possible, appropriately supported, and financially feasible and that results in the highest value." *Oconee Landing*, T.C. Memo. 2024-25, at \*59 (quoting *Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse III*), 139 T.C. 304, 331 (2012); *see also Savannah Shoals*, T.C. Memo. 2024-35, at \*37. "The highest and best use inquiry is one of objective probabilities." *Esgar Corp. v. Commissioner*, 744 F.3d at 657.

"While highest and best use can be any realistic, objective potential use of the property, it is presumed to be the use to which the land is currently being put absent proof to the contrary." *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7. Where "an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value." *Id.* (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

If different from the current use, a proposed highest and best use requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985); *see also Savannah Shoals*, T.C. Memo. 2024-35, at \*37. Any proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable" are to be excluded from consideration. *Olson*, 292 U.S. at 257; *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*30; *Oconee Landing*, T.C. Memo. 2024-25, at \*65.

"Where, as here, the parties proposed different uses, we consider '[i]f there is too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021) (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). "The principle can also be articulated in terms of willingness to pay. If a proposed use is too risky for 'a hypothetical willing buyer [to] consider [the use] in deciding how much to pay for the property,' then the use should not be deemed the highest and best available." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000 n.14 (quoting *Whitehouse II*, 615 F.3d at 335).

On several occasions, we have applied these general principles to the mining context:

> Where the asserted highest and best use of property is the extraction of minerals, the presence of the mineral in a commercially exploitable amount and the existence of a

**[\*42]** market "that would justify its extraction in the reasonably foreseeable future" must be shown. *United States v. 69.1 Acres of Land*, *supra* at 292. "There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market." *United States v. Whitehurst*, 337 F.2d 765, 771–772 (4th Cir. 1964); *see also United States v. 494.10 Acres of Land*, 592 F.2d 1130, 1132 (10th Cir. 1979) (stating that "if the 'future' is beyond or very much beyond the 'near future,' the use becomes speculative").

*Esgar Corp v. Commissioner*, 2012 WL 371809, at \*8;[18] *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*35.

### 2. *Analysis*

Beasley Timber argues that the highest and best use of the property is a landowner-operated kaolin mine, positing a business model similar to that of Arcilla. The cornerstone for this conclusion is the GMT mineral report, which was relied upon not only by Mr. Hayter's appraisal but by each of JL Minerals's experts. Specifically, Benjamin Black (author of the GeoLogic report) started from GMT's drilling data and then offered his own analysis of the kaolin bed and how a mine could be operated on the property to recover the maximum amount of the deposit, a point assumed but left unsaid in the original GMT report. Building on GMT and Mr. Black, Dr. Criss Capps produced a "resource valuation report," which concluded the kaolin "meets all industry specifications" for a kaolin reserve with a net present value between $17.6 and $21.5 million. Two appraisers, Douglas Kenny and Thomas Spears, each appraised the easement property, concluding that the mineral deposit described by GMT made the property unique and deriving value from sales of comparable properties impossible. They accordingly both used a discounted cashflow analysis to value the property, assuming a highest and best use of a landowner-operated kaolin mine along the lines of Arcilla.

For his part, the Commissioner turns to a three-member team of experts from SRK Consulting, a consulting firm specializing in mining.

---

[18] As we have noted, although the cited cases involved eminent domain or condemnation, "[f]air market value 'does not vary according to whether the taxpayer is seeking a charitable deduction for property contributed or an adequate and just compensation for property condemned.'" *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*8 n.12 (quoting *Klopp v. Commissioner*, T.C. Memo. 1960-185).

**[\*43]** Bart Stryhas testified with respect to deficiencies in GMT's methods and report. Dr. Stryhas further explained that, even assuming the reliability of GMT's data, its conclusions as to the amount of kaolin that could be mined were vastly overstated. Dr. Silver Miller testified about practical questions bearing on topics such as mine pit walls, topography, and overburden that cast doubt on the viability of a mine on the easement property. Finally, Matthew Sullivan explained that the GMT report did not permit declaring the deposit either a mineral resource or reserve[19] as necessary for the evaluation of the economic viability of a mining project. Consistent with the conclusions of these experts that there was insufficient data to presume a viable mine on the easement property, the Commissioner's appraisal expert concluded that the highest and best use in 2017 was its then-current use, i.e., agricultural/residential/recreational use with knowledge of mineral on

---

[19] According to guidelines from the Society for Mining, Metallurgy, and Exploration (SME Guide), a "[m]ineral [r]esource is a concentration or occurrence of solid material of economic interest in or on the Earth's crust in such form, grade, or quality and quantity that there are reasonable prospects for eventual economic extraction." "The term 'reasonable prospects for eventual economic extraction' implies a judgment . . . with respect to the technical and economic factors likely to influence the prospect of economic extraction, including the approximate mining parameters." "Portions of a deposit that do not have potential for eventual economic extraction . . . cannot be included," which implies that resources "are constrained within pit shells for surface mining methods."

Mineral resources range in order of increasing confidence into inferred, indicated, and measured classes. An "inferred" resource is "part of a [m]ineral [r]esource for which quantity and grade or quality are estimated on the basis of limited geological evidence and sampling" and reasonably assumed, but not verified, "geological and grade or quality continuity." "Caution should be exercised if [inferred resources] are considered in technical and/or economic studies. This class of material should not be used to economically support Mineral Reserves." An "indicated" resource means that part of a resource for which "grade or quality, densities, shape and physical characteristics are estimated with sufficient confidence to allow the appropriate application of [m]odifying [f]actors [i.e., technical and economic parameters including mining, processing, metallurgical, economic marketing, legal, environmental, infrastructure, social and governmental factors] in sufficient detail to support mine planning and evaluation of the economic viability of the deposit." A "measured" resource is the part of a mineral resource "for which quantity, grade or quality, densities, shape, and physical characteristics are estimated with confidence sufficient to allow the application of [m]odifying [f]actors to support detailed mine planning and final evaluation of the economic viability of the deposit."

A mineral reserve is the economically mineable part of a measured or indicated resource. Like a resource, a reserve has varying levels of confidence, i.e., probable or proven, depending on the confidence in the modifying factors.

[*44] the site and the opportunity to obtain legal entitlements allowing mining.

In addition to the gaggle of experts on both sides, the parties (and we) place heavy reliance on information gleaned from industry participants given the small and cloistered nature of the kaolin industry. We are treating industry information and data at a relatively high level of abstraction (and have sealed certain parts of the record) to preserve confidential information provided by the industry.

The extensive record before us leaves no doubt—kaolin mining was not the highest and best use of the easement property in 2017.

a. *Behavior of Market Participants*

We start with the real world. To put it bluntly, multiple kaolin processors had taken a close look at the easement property and, in at least two cases (Huber and then its successor, KaMin) decided that it was not worth mining or even keeping it as part of a long-term reserve. The actions of kaolin experts with skin in the game torpedo JL Minerals's contention that the kaolin on the easement property "would justify . . . extraction in the reasonably foreseeable future." *Esgar Corp. v. Commissioner*, 2012 WL 371809, at *8 (quoting *69.1 Acres of Land*, 942 F.2d at 292); *see also Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 998 n.12 ("Determining the properties' highest and best use necessitated a look at market demand, so the tax court could not be faulted for taking that look."); *Esgar Corp. v. Commissioner*, 744 F.3d at 658 ("The Tax Court was not bound to accept . . . mining as the properties' highest and best use if that use was not reasonably probable to manifest in the reasonably near future.").

By way of refresher, the market for crude kaolin in Georgia at the end of 2017 primarily involved four major kaolin processors, which sought various types of kaolin meeting precise specifications, as well as a few minor processors that focused on lower grade kaolin suitable for air-float processing. *See supra* pp. 6–10. Given the need for categories of kaolin meeting extremely precise requirements, the major processors mined 95–100% of their own supply and held decades of inventory (either through lease or purchase) for each of the types of kaolin needed for their various end products. These majors only occasionally turned to Arcilla, which had higher costs and required additional layers of quality control by the processors. And it was exceedingly rare for the major

**[*45]** processors to buy kaolin from a landowner that had mined the kaolin itself.

As part of the century-long odyssey to find sources of kaolin in the Georgia Kaolin Belt, multiple kaolin companies drilled and tested the Scaly Knob property, of which the easement property was part. From 1980 until the Club took over in 2001, the Scaly Knob property was drilled and tested four times by both forerunners to the major companies (which inherited the data) and air-float processors. This land, in other words, was *terra* very much *cognita*.

Only one of the companies during this period, Englehard (later to become part of BASF), decided to mine the Scaly Knob property based on what they had found. As Mr. Mills, who "was intimately familiar with the kaolin deposits in the area," explained, the other companies "found no clay that they wanted to use."

Englehard's mine separated the two tracts of what later became the easement property, with the mine itself ultimately reclaimed as the pond over which the hunting lodge sat. Englehard opted to close its mine rather than expand onto the part of the Scaly Knob property that was to become the easement property. Given the inherent advantages stemming from expanding an already-operating mine rather than opening a mine afresh, the closing of the mine (without any lease for future mining) is a strong indication that mining kaolin on the easement property was not economically viable, either because none of the deposits met the specifications for processing into Englehard's products or because of the costs attendant on mining an area of steep slopes and deep ravines, as Ms. Sorenson put it.

Of course, on the other side of what became the easement property was Huber's mine, making it a logical partner for the Club's kaolin dreams. In fact, as Mr. Mills explained, in his experience no other kaolin company would be interested because "there would have been too much overburden for [a mining company] to consider unless they had the adjoining property." Mr. Mills, acting on the Club's behalf, was able to entice Huber into exploratory drilling and then a mineral lease over the easement property given the proximity to its mine and possibility of kaolin deposits similar to the ones that Huber already was mining.

Huber performed exploratory drilling and testing in the northern half of the easement property, an approach consistent with Mr. Mills's observation that the overburden in the southern half was "too great to

[*46] justify removing it." Despite its exploratory drilling, however, Huber took no further action. The decision not to move forward with mining the kaolin on the property again suggests that it was not usable by Huber. As Mr. Mills put it, a kaolin company that left a valuable deposit in the ground "wouldn't be in business very long . . . because it costs a lot of money to lease a property and to drill it and to test it and to run it through all the special testing that's required."

Mr. Mills did not disagree with Huber's conclusion. As part of the mineral lease, Mr. Mills obtained, on the Club's behalf, Huber's drilling data with an eye to marketing the property to other kaolin companies using that data if Huber did not mine. Mr. Mills testified, however, that he "didn't see anything [in the drill data] that [he] could take to a kaolin company that would convince them to mine the property."

KaMin acquired the rights to drill the easement property as part of its acquisition of Huber's kaolin arm in 2008. It too elected not to mine the property from 2008 through 2013, or to keep the property under lease as part of its reserves thereafter. The evidence before us shows that KaMin took this course because other properties that it controlled contained kaolin meeting the same specifications, but at more favorable locations. Moreover, the evidence demonstrates that KaMin's data indicated that the portion of the easement property kaolin that could be used in its operations was a small fraction of the purported GMT's 5.3-million-ton estimate.

This is not the only real-world evidence suggesting that familiarity with the easement property bred lack of interest. In 2016 Mr. Rivers sought Scaly Knob drilling data from Imerys, BASF, and KaMin, explaining that the owner was interested in conserving the property. Although a conservation easement would mean the kaolin on the easement property would be off the market forever, none of the major kaolin companies—who, again, planned for their needs decades in the future and had drilling data from their predecessors about the deposit—offered to buy or lease the property to preserve the ability to mine at some point. If the data before them showed untapped potential, the industry would have come calling. We draw the appropriate conclusion from its decision not to do so.

We also are aware that the major processors often entered into agreements amongst themselves that allowed for buying or swapping unwanted kaolin. This course of practice would suggest that if Huber or KaMin had believed that the kaolin on the easement property would be

[*47] of interest to any of the other processors, either would have approached them. They did not do so.

The market spoke plainly about the economic viability of a kaolin mine. Market choices suggest that the kaolin on this property fits within Mr. Mills's experience having drilled thousands of properties for kaolin companies: "the majority of the properties . . . drilled during [his] work there did not find viable kaolin deposits. They may have had kaolin on the property, but it wasn't worth mining, and it wasn't worth keeping the lease in hopes of future mining."

### b. *Expert Testimony*

Beasley Timber nonetheless holds fast to its conclusion that kaolin mining was the highest and best use of the easement property, relying on the conclusions in the GMT report as supplemented by the GMT supplemental report and Beasley Timber's other experts. The evidence before us shows that GMT's reports cannot bear the weight placed on them and that Beasley Timber has not demonstrated a commercially exploitable amount of kaolin and the existence of a market that would justify its extraction in the reasonably foreseeable future. *Esgar Corp. v. Commissioner*, 2012 WL 371809, at *8; *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at *35.

### i. *GMT Credibility*

We start by noting our considerable skepticism about GMT's credibility. We acknowledge that Mr. Ginn and the company that he built were experts in mineral analysis, particularly in the field of kaolin.

Starting in 2016, however, GMT aggressively pursued work supporting mineral-based conservation easements. Working on conservation easements, of course, does not call into question one's credibility. Our concerns stem from the fact that on at least eight occasions to our knowledge GMT concluded that a property in rural Georgia had an extremely large kaolin deposit (ranging between 3.6 and 6.4 million tons of kaolin), which was later used to support a very large charitable contribution deduction (between $14.6 and $22 million dollars). If GMT were correct, the entire kaolin industry has failed to appreciate hundreds of millions of dollars of valuable kaolin right under its feet, despite decades of drilling and testing and buying and selling. Occam's razor suggests a different result: GMT repeatedly overstated the amount of commercial-grade kaolin in its reports.

**[*48]** We have more specific concerns about GMT's original report in this case. In the original report, GMT stated that it had directed drilling of 16 drillholes on the easement property in 2016 and 2017. It then laid out its analysis based on the results from those 16 samples. But that description was not correct. As both parties agree, GMT (using Waters Drilling) drilled 20 drillholes, with four of them losing circulation before hitting kaolin. The omission from the report of information related to 20% of the total drillholes raises questions about the thoroughness of the report's analysis (to be charitable) or selective use of data (to be less so).

### ii. *Kaolin Deposit*

Even setting these doubts aside, we are unpersuaded that the GMT report, together with the various experts' reports Beasley Timber commissioned for trial, shows the existence of a commercially exploitable amount of kaolin, as well as a market that would justify its extraction in the reasonably near future. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at *35; *Esgar Corp. v. Commissioner*, 2012 WL 371809, at *8. The GMT report is simply too preliminary and too vague to provide a sure foundation for Beasley Timber's position, lacking the kind of analysis that industry participants engage in when deciding whether mining a property makes economic sense. And none of the expert reports, each of which relies on the GMT report, cures its failings.

By way of review, GMT concluded from its analysis of the drilling samples that the easement property contained over 5,304,000 short wet tons of average to excellent quality kaolin clay that was well within desirable clay reserve parameters. The GMT report further concluded an average overburden of 92 feet, a clay strata thickness of 40 feet, and an overburden-to-clay ratio of 2.3:1. The report stated that the results of the drilling moved the easement property "from a potential mineral resource into the defined category of 'Identified Mineral Reserve.'"

The report also examined economic prospects for mining the kaolin. After noting that the amount of kaolin could support mining 150,000 to 250,000 crude wet tones annually for at least 20 years (using simple division), GMT opined that JL Minerals could operate as a "contractor with limited competition from other contractors or the actual kaolin producers." The report mused that JL Minerals could replicate Arcilla's business model "with experienced contractors and consultants," which could fetch a price of $14–$22 per ton. We have multiple problems with these conclusions, but we will concentrate on three major issues.

**[*49]**                                                a)      *Sufficiency of Data*

We start with the drilling of the property, which was meant to gather sufficient data to obtain a reasonable indication of the quality and size of a deposit on the property. As explained by Dr. Miller, the State of Georgia recorded that kaolin companies usually drill 50–100 drillholes for every 100 acres of property, which would equate to approximately 30–60 drillholes on the easement property. The 16 drillholes that GMT analyzed here are barely more than half the low end of the number of drillholes the kaolin industry itself uses, raising questions about the adequacy of the data.

Deepening these questions is the manner in which drilling was conducted. The kaolin industry witnesses all told a common story on this point. When first exploring a property, a kaolin company would engage in sporadic drilling or drilling with relatively wide spacing (400–800 feet) between drillholes. When more information about the size and the qualities of the deposit became necessary, the drilling changes to a grid system with ever-tightening space (400 to 200 to 100 to 50 feet, in some cases) between drillholes sometimes over years of testing.

The industry uses the grid method because it is the most reliable way to gather information about the types of kaolin on a property. This information is critical given the need to feed specific plants kaolin meeting precise specifications. As Mr. McKenzie explained, the grid method "makes it easier to do the calculation knowledge [because] . . . you know the area of influence." He further testified that, in the absence of a grid, "certain areas extend out further," which "would affect [the] calculations for different types of clay and different parts of the grid."

The progress from wide-spaced, sporadic exploratory drilling to more regularized grid-based drilling aligns with the SME Guide, which explicitly differentiates exploratory results from the category of a mineral resource or reserve. Even in the category of mineral resources, these guidelines caution that an "inferred" resource, (i.e., one "for which quantity and grade or quality are estimated on the basis of limited geological evidence and sampling" and reasonably assumed, but not verified, "geological and grade or quality continuity") "should not be used to economically support Mineral Reserves."

Despite having the benefit of KaMin's drilling data, GMT performed sporadic, wide-spaced drilling of the easement property concentrated on roads and the boundaries of the property. The results

**[*50]** of this drilling are best understood as exploratory and preliminary, lacking the hallmarks of reliability developed by the industry. As the SME Guide explains, exploratory results "do not form part of a declaration of Mineral Resources or Mineral Reserves," and are "common in the early stages of exploration when the quantity of data available is generally not sufficient to allow any reasonable estimates of Mineral Resources." At best, the GMT drilling results could be categorized under SME Guide as an "inferred" resource, too uncertain to be used to economically support a mineral reserve.

To sum up, the haphazard and cursory GMT drilling program failed to provide the quantum of reliable data necessary to conclude that a mine was reasonably probable in the reasonably near future. There is nothing in the preliminary results produced by the drilling program that might suggest the industry had previously incorrectly evaluated the easement property's mining potential.

b) *The Market*

The GMT report, as well as the reports of Dr. Capps, Mr. Spears, and Mr. Kenny, further fails to identify a market that would justify extraction in the reasonably near future. The GMT report concludes at a very high level of abstraction that the property contains "average to excellent" kaolin that was "well within desirable clay reserve parameters" and these "reserves would easily integrate into a modern kaolin processing facility for manufacturing kaolin and kaolin based products." Dr. Capps took the baton from there, opining that the demand for kaolin was moderate to high, that the "high quality" reserve would be absorbed by the market, and that the kaolin on the property could support a mine lasting decades. The baton was then passed to the valuation experts who relied on "market demand for the resources due to their quality as referenced by the geological studies, independent lab results, various market information, and [Dr. Capps's report]." In essence, Beasley Timber's position is that the "average to excellent" quality of the kaolin would plainly find a market and justify extraction.

The problem is that this is not how the kaolin market works. Every kaolin industry witness who testified at trial agreed on this point: Specifications for processing drive the market. In the kaolin industry, customers (i.e., the processors) define their needs for different types of kaolin meeting assorted technical specifications to be processed into a set end product at a particular plant. The companies then source the types and volumes of kaolin required. Unsurprisingly, the major kaolin

[*51] processors fulfill 95–100% of their needs from their own supply, which stretches decades into the future for each category of kaolin necessary for a product. In other words, major kaolin processors are not looking for the platonic form of "good" kaolin but kaolin with very precise characteristics to fulfill technical needs at a given time.

We struggle with the common conclusion of the GMT report and the supporting experts that a kaolin deposit vaguely categorized as "average to excellent" would find a place in this specialized market. The testimony establishes that major kaolin processors are not looking to outside suppliers for their kaolin needs, except as a last resort and with considerable reluctance. This reluctance is rooted in the fact that the processors need to assure themselves that any kaolin meets their demanding requirements, which entails testing outside supply themselves and tight quality control. Additionally, relying on outside suppliers was more costly than relying on one's own kaolin reserves. The testimony shows that this aversion to outside supply even stretches to Arcilla, a longstanding industry participant.

The demanding technical requirements and decades worth of preexisting inventory of all types of kaolin are only part of the problem with Beasley Timber's assumption that a market would snap up JL Minerals's kaolin. Timing is also an issue. The testimony at trial demonstrates that the major processors look to their sales of end products as well as their plants to determine what kaolin is needed over the following few months. Assuming that JL Minerals could identify a particular type of kaolin on the easement property that would be of interest to a processor, there is no indication that the timelines would sync up. And, if they did, JL Minerals would then be faced with competing to convince the processor to buy JL Minerals's kaolin rather than using the processor's own abundant, well-verified inventory or the already established Arcilla.

We see absolutely no indication that the segment of the kaolin market represented by the major processors would support extraction of the little understood kaolin on the easement property in the reasonably near future, much less support a landowner-operated kaolin mine.

Although we have addressed only one segment of the kaolin market, we believe that the issues inherent in failing to identify with any specificity the markets for the various types of kaolin on the easement property span all segments. The GMT report does not demonstrate that kaolin from the easement property would be suitable

[*52] for air-float processing or manufacturing into proppants or refractory material. Of course, these are all lower end parts of the kaolin market with less revenue that might not justify extraction.

The GMT report and the economic experts point to Arcilla as evidence that a market exists for kaolin generated by a landowner-operated mining business. Arcilla is not comparable. It has been in existence since 1992 and during that time has conducted extensive exploratory drilling throughout the Georgia Kaolin Belt, culminating in leasing or purchasing land. Arcilla thus replicates the major processors in having a firm understanding of the precise types of kaolin on the properties it controls, as well as the particular applications that the kaolin can be used for by processors. According to Mr. McKenzie, most of the kaolin that Arcilla mines is sold for air-float processing and manufacturing into proppants. We see no support for the idea that Arcilla would have succeeded with a mine-first, customer-later strategy that JL Minerals assumed. We also question whether declining domestic market demand would support a competitor to Arcilla. Absent more analysis regarding the types of kaolin on the property and the market segments in which Arcilla is active, we are hard pressed to draw any conclusions from its example.

As Mr. McKenzie credibly testified, a new mining company would face particular challenges in entering the kaolin industry. Competing in this market required mining equipment and a lab to analyze the kaolin, as well as people to run both. As Mr. McKenzie put it, in 2016 and 2017 "[t]here just weren't people available and it was just a complicated business."

Telescoping out somewhat, trends in the international kaolin market also cast doubt on the market prospects for this kaolin. Domestic kaolin production declined 35% within the period from 2000 through 2017, per the U.S. Geological Survey. As illustrated by the careers and testimony of Messrs. McKenzie and Mills, the kaolin industry went through decades of consolidation and acquisition as the market tightened. We credit Dr. Miller's belief that, as of 2017, the kaolin market was at an equilibrium where demand equaled supply because of the already established market and the sheer amount of mining that already existed in the area. Given the structure of the market and the equilibrium, we simply do not believe a new mine, especially of the type that JL Minerals hypothesizes, would find a market for the kaolin.

**[*53]** To sum up, by sticking to generalities about the types of kaolin on the property, the GMT report, and its valuation acolytes, have failed to establish the existence of any market for this kaolin, much less one that would justify the extraction of the kaolin in the reasonably near future. Beasley Timber lacks any "objective support for future demand, including volume and duration" and relies on "[m]ere physical adaptability to a use." *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*8 (quoting *United States v. Whitehurst*, 337 F.2d 765, 771–72 (4th Cir. 1964)). This is not enough to establish a market. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at \*35; *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*8.

c) *Mining Issues*

We are also unconvinced of the existence of a commercially exploitable amount of kaolin on the easement property. Even assuming that drilling data was sufficient to categorize the kaolin deposit as an "indicated" mineral resource or mineral reserve for which economic analysis would be appropriate, we have no confidence that the numbers would make any sense.

The GMT report estimated that the property has 5.3 million tons of kaolin but makes no provision whatsoever for how exactly to mine the property. To fill in the gap, Beasley Timber turns to Mr. Black at GeoLogic, who uses the GMT data to estimate a "resource" on the property of 7.9 million tons, of which 3.9 million tons were declared a "reserve." Mr. Black noted that the mine plan models with slopes inside the property lines would now allow the recovery of the 5.3 million tons of kaolin calculated by GMT, but an "expanded, backcut slope starting on the neighboring property . . . consistent with industry practices . . . would increase estimated mineable kaolin reserve values . . . to approximately 6.4 million short tons."

Although the experts basically agree on the raw numbers generated from the GMT data, they have strenuous disagreements over the amount of kaolin that could actually be mined, focusing on questions of pit slope walls and overburden. In our view, the most critical insight comes not from the retained experts, but from the testimony of the industry witnesses. They explained that kaolin mining was an iterative process in which the company mining a property routinely compares (1) the costs of removing the overburden and hauling the kaolin to a processing plant with (2) the value of the kaolin obtained. Given the steep topography and vastly varying overburden amounts on the

**[\*54]** easement property, we believe that sooner or later the equation would militate in favor of closing the mine rather than expanding into an area with high overburden, thus undermining Mr. Black's conclusion as to the amounts of kaolin that could be extracted.

Moreover, the industry witnesses emphasized the critical importance of location in determining the value to be derived from a kaolin property. Crude kaolin meeting required specifications must be transported to a plant that needs kaolin of that type or a blunging site to be made into slurry and transported by pipeline. The lack of information regarding the types of kaolin on the property and thus the potential buyers make it impossible to evaluate the crucial hauling costs and determine whether kaolin mining would, in fact, be economically feasible.

c.    *Conclusion*

In summary, we reject Beasley Timber's argument that the highest and best use of the easement property in December 2017 was as a kaolin mine. Although the property contained a kaolin deposit, the conduct of informed market participants over decades convinces us that mining was not reasonably probable in the reasonably near future. Beasley Timber has failed to show otherwise, relying on preliminary and generalized information that suggests no particular market and a report that engenders no confidence. Although we grant its point that future innovations might have transformed the deposit into a thing of value, this outcome "depend[s] upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable." *Olson*, 292 U.S. at 257; *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*30. As is, there is simply "too high a chance that the property will not achieve the proposed use in the near future," in which case "the use is too risky to qualify." *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings, Ltd. v. Commissioner*, 812 F.3d at 1000). The highest and best use accordingly remains the easement property's current use, agricultural/residential/recreational use with knowledge that some mineral exists on the site.

C.    *Valuation of the Easement Property*

1.    *Legal Framework*

Having determined the highest and best use of the property, we next turn to determining its value before the grant of the easement.

**[\*55]** Unsurprisingly, "[t]his Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." *Buckelew Farm*, T.C. Memo. 2024-52, at \*56; *see also Corning Place*, T.C. Memo. 2024-72, at \*28; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*31 ("The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at \*14. For these purposes, both we and the Eleventh Circuit have "f[ou]nd the purchase [of a partnership interest] reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself." *Buckelew Farm*, T.C. Memo. 2024-52, at \*56; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368 (finding that the sale price for a 98.99% interest in a partnership, whose only meaningful asset was property on which an easement was granted shortly thereafter, was representative of the "before" value of the property); *Oconee Landing*, T.C. Memo. 2024-25, at \*71–72.

In addition to previous sales, we often draw on one or more of three common approaches to determine the fair market value of a piece of real property: (1) the market, or comparable sales approach; (2) the income approach; and (3) a cost, or an asset-based approach. *See, e.g.*, *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can vary according to the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at \*31–32; *Savannah Shoals*, T.C. Memo. 2024-35, at \*35–36. The approaches provide a valuable sanity check for each other and for the value indicated by previous sales. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at \*32.

2. *Analysis*

The parties each rely on different champions. For his part, the Commissioner looks to previous sales of the easement property, complemented by the comparable sales approach. Beasley Timber turns to the income approach, asserting that the results of the GMT testing

**[*56]** meant that this property was unique and income producing, rendering irrelevant any reference to other sales.

Before engaging with the parties' respective analyses, we first reject Beasley Timber's contention that the GMT report transformed the easement property into something unique. As we have explained at length, the GMT report is, at best, a vague and preliminary analysis of exploratory drilling results. A knowledgeable buyer and seller would take this report with a grain of salt, establishing the possibility that a kaolin deposit of undefined quality exists on the easement property. Of course, it was no secret that the property was in the heart of the Georgia Kaolin Belt, kaolin companies had drilled on or around the easement property multiple times, and, as seen in public records, a lengthy mineral lease over the easement property passed between two processors, neither of whom chose to open a mine.

Nor do we believe that GMT's word alone would move the needle. The trial testimony establishes that at least two kaolin processors elected not to mine properties touted by GMT (despite receiving favorable testing data), consistent with general industry practice for processors to rely on their own testing.

The GMT report, in short, does little to distinguish the easement property or render inapposite prior sales of the easement property or sales of other properties that might contain kaolin.

a. *Actual Transactions Involving Property*

The results of the actual transactions involving the property provide consistent and compelling evidence of the easement property's value. We first consider the arm's-length sale of the Scaly Knob property from the Club to Free-Wil for $1.6 million in December 2015, which works out to $2,481 per acre. Beasley Timber argues that this was a distressed sale, noting that relations inside the Club were collapsing and some of the members were in need of money. The record before us establishes that the Club, comprising almost exclusively successful and knowledgeable businesspeople, sought and believed that they had received a fair price for the property. The facts before us further show that both the Club and Free-Wil were well aware of the Huber lease, and thus the potential for kaolin mining. Even the Club member who believed most strongly in kaolin mining offered approximately the same price ($1.7 million, a per-acre value of $2,636) to purchase the Scaly Knob property and believed that the easement property's maximum

[*57] value was $2.5 million ($3,875 per acre). The $2,481 price per acre for the Scaly Knob property accordingly provides strong evidence of the value of the easement property.

We next look to the January 2016 sale of a 98% interest in JL Minerals (which held the easement property as its only asset) by Free-Wil to Beasley Timber for $167,837. Doing some simple math, the 98% interest in the partnership (with the easement property as its only asset) suggests a total property value of $171,262 (calculated by dividing $167,837 by 98%). This amount, in turn, reflects a per-acre value of $2,647, which is largely consistent with the sale from the Club a few months earlier.

We note that the buyer and the seller were both aware of the existence of the Huber lease in January 2016, and thus the possibility for kaolin mining. Underscoring this point, we believe that savvy businessmen like Messrs. Beasley and Johnson understood that the 64.7 acres covered by the Huber mineral lease were spun off from the rest of the total 1,116 acres for a reason. Beasley Timber was buying timber to be cut and, as a cherry on top, a property ready made to support a lucrative conservation easement deduction to offset its earnings.

One other, unconsummated, transaction catches our eye. In 2017 Mr. Freeman was approached by Mr. Loudermilk, a very experienced Georgia real estate buyer, to gauge his interest in purchasing all 1,116 acres that Beasley Timber owned through Jackson Lake and JL Minerals. Mr. Freeman pitched to Mr. Loudermilk the 2016 drilling data on the easement property and attempted to entice him with the prospect of a lucrative conservation easement deduction in addition to the value of the land itself. Mr. Loudermilk, aware that vacant land in Wilkinson County went for $600–$2,400 per acre, broke off discussions because he refused to go above $5 million ($4,480 per acre) even in light of the drilling data and the potential for a sizable tax deduction.

The record before us provides strong evidence that the true value of the easement property—even inflated with the prospect of tax benefits—was a tiny portion of the $259,815 per-acre value that JL Minerals claimed as a deduction.

b.      *Comparable Sales Approach*

The comparable sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals*, T.C. Memo. 2024-35, at *36 (first

**[\*58]** citing *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); and then citing *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979)). "Because no two properties are ever identical, the appraiser must adjust the sale prices of the comparables to account for differences between the properties (e.g., parcel size, location, and physical features) and the terms of the sales (e.g., proximity to valuation date and conditions of sale)." *Id.* (citing *Wolfsen Land & Cattle Co.*, 72 T.C. at 19); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*33. The reliability of a comparable sales analysis depends on the comparability of the properties selected as comparables and the reasonableness of the adjustments made to the prices to establish comparability. *Wolfsen Land & Cattle Co.*, 72 T.C. at 19–20.

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation.'" *Oconee Landing*, T.C. Memo. 2024-25, at \*67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*38; *Savannah Shoals*, T.C. Memo. 2024-35, at \*35. "The comparable sales approach is usually the most reliable indicator of value when sufficient information exists" because "the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Corning Place*, T.C. Memo. 2024-72, at \*32 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24).

Sales of properties similar to the easement property generally confirm the values seen in the previous transactions. Operating from the idea that the GMT report rendered the easement property unique, Mr. Hayter and the Beasley Timber experts did not analyze comparable properties. The Commissioner's expert, Mr. Sheppard, thus has the field to himself, aside from Beasley Timber's attacks on him. We find his results persuasive.

Mr. Sheppard concluded that sufficient sales data existed in the primary trade area for similarly configured tracts with a similar highest and best use (i.e., agricultural/residential/recreational use with knowledge of mineral on the site and the opportunity to obtain legal approvals to allow mining). Out of a pool of several hundred sales, Mr. Sheppard found 12 sales of properties that he deemed "comparable" because of exploratory-stage knowledge of kaolin on the respective properties. Mr. Sheppard focused on transactions sold or purchased by a known kaolin operator that involved land sales of "active mines, adjacent land area for expansion of an existing mine, land intended for (observable using current aerials, views from the street, press releases,

**[*59]** etc.) immediate or short-term mine development, and land speculatively purchased but not mined (also observable using aerials, views from the street, lack of press releases, etc.)."

From the 12, Mr. Sheppard ultimately selected 4 that he believed to be "the most similar in terms of size/acres, location, and date of sale:"

●Comparable #1: This sale involved a 161.62-acre parcel in Wilkinson County, Georgia, which was purchased by Cascadas de Agua Azul, LLC (Agua Azul), in August 2016 for $332,775 ($2,059 per acre). At the time of sale, the property was adjacent to a large BASF kaolin mining pit and plant, had proximate highway access, and was not zoned for a specific use. The seller, an individual, retained rights to 50% of any royalties paid from mining on the property.

●Comparable #2: This sale involved a 79.09-acre parcel in Wilkinson County, Georgia, which also was purchased by Agua Azul in August 2016, for $197,564 ($2,498 per acre). This property likewise abutted the large BASF kaolin mining pit and plant, had proximate highway access, and was not zoned for a specific use. The seller of this property (a limited liability company) also reserved rights to 50% of any royalties paid from mining the property.

●Comparable #3: This sale involved a 101.76-acre parcel near Wilkinson County, Georgia, which was purchased by Redsprings Properties, LLC, in May 2015 for $150,000 ($1,474 per acre). The seller, a limited liability company, transferred the property in fee simple. The property was in an area with a major concentration of kaolin processing plants but along an interior road as opposed to a highway.

●Comparable #4: This sale involved a 191.13-acre parcel in Wilkinson County, Georgia, which was purchased by Imerys in February 2015 for $382,000 ($1,999 per acre). KaMin, the seller, transferred the property in fee simple. The property was located a similar distance from major kaolin processing plants as the easement property on an interior road and was not zoned for a specific use.

As part of his analysis, Mr. Sheppard made upward adjustments to the sale prices of the four properties to account for characteristics

[*60] inferior to those of the easement property, including reservation of rights, highway access, location, property infrastructure, and topography. After the adjustments were made, Mr. Sheppard concluded that the "before value" of the easement property was between $1,862/acre and $2,639/acre with Comparable #2 being the most similar overall giving a fair market value indication for the easement property at $2,563/acre. On the basis of these facts and all the sales data, Mr. Sheppard concluded that the fair market value of the entire easement property, as of December 2017, was "$162,000, rounded ($2,500/acre for the 64.70 acre subject property)."

At trial and in brief, Beasley Timber critiques Mr. Sheppard's valuation, pointing out that in previous takings litigation he had opined that a property containing kaolin had a value in excess of $90,000 per acre. This point is unpersuasive. The property at issue in the previous litigation was at a wholly different stage in development, with KaMin already leasing the property and having conducted extensive drilling (e.g., 36 drill holes on approximately 20 acres) that provided precise information regarding the exact type of kaolin on the property, which supported actual market analysis. In this case, there is little more than a guesstimate that there might be commercially exploitable kaolin on the property, with the actions of market participants providing strong suggestions to the contrary.

We believe that Mr. Sheppard's analysis and conclusions are sound and conclude that they generally confirm the results of the actual transactions involving the easement property.

c.     *Income Approach*

The income method values a property by computing the present value of projected future income from the property. *Chapman Glen Ltd.*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at *33; *Savannah Shoals*, T.C. Memo. 2024-35, at *36. "The theory behind an income approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income." *Savannah Shoals*, T.C. Memo. 2024-35, at *36 (citing *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, *aff'd*, 493 F. App'x 944 (10th Cir. 2012)); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at *33.

[*61] Beasley Timber argues that the income approach best captures the value of the easement property, given its view that the GMT report made the property unique and a landowner-operated kaolin mine represented the highest and best use. We disagree on both points. GMT's work on eight conservation kaolin easement cases, finding approximately the same quantity of purportedly valuable kaolin worth approximately the same belies the contention that this property is unique. And, for reasons that we already have detailed, the highest and best use of the property is not a kaolin mine. Our issues with the use of the income approach in this context run deeper than just highest and best use, however, and would require rejection of this approach even if we were to agree that kaolin mining was plausible.

"The income capitalization [approach] is most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates. A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *43–44 (citing *Whitehouse III*, 139 T.C. at 325 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings")).

"Income valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable." *Savannah Shoals*, T.C. Memo. 2024-35, at *36; *see also Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *33. "The income approach is rarely appropriate when seeking to determine the value of undeveloped property with no existing cashflow." *Corning Place*, T.C. Memo. 2024-72, at *37; *see Excelsior Aggregates*, T.C. Memo. 2024-60, at *44 ("[C]ourts have often noted 'the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings.'" (quoting *Pittsburgh Terminal Corp v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision))); *see also Chapman Glen*, 140 T.C. at 327; *Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador Apartments*, 50 T.C. at 243–44; *Savannah Shoals*, T.C. Memo. 2024-35, at *36. "Absent a financial track record, every input into the DCF analysis necessarily involves speculation." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44; *see also Corning Place*, T.C. Memo. 2024-72, at *37 ("Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates."). "That problem would be

[*62] at its apogee here—attempting to predict the future revenues and expenses of a nonexistent business for a 30-year period." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44; *see also Corning Place Ohio*, T.C. Memo. 2024-72, at *37–38.

"When the income approach is used, the Court must examine the plausibility of the critical assumptions made by the appraiser." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44 (citing *Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820). "Each assumption, whether large or small, carries with it 'some risk of error.'" *Id.* (quoting *Whitehouse III*, 139 T.C. at 323). "As interdependent assumptions multiply, the risk of error can increase exponentially." *Id.*

We begin with the simple observation that the evidence before us, including the testimony of market participants, firmly establishes that no one involved in the kaolin industry would have paid nearly $17 million for the easement property even if a person were to credit the GMT report and the discounted cashflow analyses that followed it. To put it another way, no rational businessperson would pay the net present value of a business simply to buy the property, as is implicit in Beasley Timber's position equating the two values. *Savannah Shoals*, T.C. Memo. 2024-35, at *45 ("We are not convinced that a quarry operator would pay the [mineral's] net present value for the land as there would be no means for a profit.").

This conclusion is underscored by the principle of substitution, i.e., that "a prudent man will pay no more for a given property than he would for a similar property." *Mill Road*, T.C. Memo. 2023-129, at *51 n.30 (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). GMT's own track record indicates that properties with similar deposits of kaolin are plentiful in Wilkinson County, and yet Messrs. Beasley and Loudermilk and various appraisers all noted that the per-acre values of land in Wilkinson County were somewhere between $600 and $2,400. No rational businessperson would pay $17 million for a piece of property with possibilities similar to one that could be purchased for under $200,000.

This example points to the oddity produced by using the income approach here. JL Minerals is claiming a deduction for donating one stick in its bundle of property rights. But according to JL Minerals's income approach, this one stick has a much greater value than what the

**[\*63]** evidence shows a market participant would pay for the fee simple property, which includes all the sticks in the bundle.

Something is plainly off. We believe the reason for the counterintuitive result is that the discounted cashflow method is not valuing the property at all, but what a speculative business could do with the property. But a discounted cashflow method geared to what a business could earn is of limited utility in determining what a property is worth.

Of course, that is not to say that the income approach is flawed. To the contrary, the income approach is reliable where a historical track record provides supported inputs. The case before us provides an illustration of an appropriate use of the income method, in fact. As the industry participants explained, kaolin mining in 2017 almost always involved a mineral lease between a processor (or Arcilla) and a property owner, according to which the property owner received agreed royalties from tonnage of kaolin mined. This type of well-established royalty agreement of course was seen in fact in the 2003 mineral lease between the Club and Huber. With historical royalty information, the use of an income approach could be used to determine the value of the land, including the royalty derived.

Where the income approach lacks good inputs, it becomes little more than fan fiction aimed at generating the highest numbers possible, no matter how objectively ludicrous. We consider as an example Dr. Capps's resource valuation report, which uses a discounted cashflow method to provide a net present value associated with mining the kaolin deposit. Without knowing more than the vague information provided by GMT, Dr. Capps predicts a very happy future for a JL Minerals-operated mine as of 2017, opining that it would carve a niche in the kaolin market its first year, then expand to 200,000 tons sold the next two years, and end with 250,000 tons sold the remainder of its 16- or 25-year mine life. Using average prices and costs, together with a 7.6% discount rate (at the top end of the normal discount rate range for kaolin companies), Dr. Capps saw nothing but success ahead had JL Minerals chosen to mine.

These rosy projections have no connection to the reality of kaolin mining that we saw at trial. Dr. Capps assumes a market that seems quite unlikely, as evidenced by the fact that there are no landowner-operated mines. The major processors have no interest in buying kaolin from outside suppliers, except as a last resort, which makes participation in the higher end of the kaolin market unlikely. Even if

[*64] they had some interest in outside supply, Dr. Capps does not explain why that supply would be met by JL Minerals rather than Arcilla, already a known supplier in the industry with considerable experience in providing kaolin meeting required specifications.

If, as seems likely, the higher end of the market is not open for business, then JL Minerals would be competing with Arcilla for a share of the kaolin market for air-float processing, to the extent that the kaolin on the property even was suitable for such use. The kaolin used for this type of processing fetches a lower price. Questions of demand are heightened given declining domestic production and the apparent surfeit of kaolin-rich properties as seen in the eight other kaolin conservation easements that GMT backed.

Keeping company with the uncertain demand are the unsupported costs. Significant parts of the cost figures (hauling and fuel surcharges) are contingent on the plant's processing the kaolin or the blunging site's receiving the kaolin. These sites are buyer specific, and consequently the distance and accompanying costs are not at all defined.

More importantly, we believe that Dr. Capps failed to fully take into account the risks of the landowner-operated mine model. We question Dr. Capps's timeline as we heard from industry representatives that a drilling and testing program could take five to eight years simply to determine the specification of the kaolin on the property to be mined. This is a far cry from his discounted cashflow that anticipated sales from mining during the first year.

Dr. Capps also seems to have basically assumed that JL Minerals would immediately be functioning like a processor or Arcilla. But, as Mr. McKenzie observed, a new business would require a lab with employees to verify the kaolin specifications, as well as a trained crew to strip overburden, mine, and haul the product. According to Mr. McKenzie, experienced hands were in short supply in 2017. To the extent that Beasley Timber argued at trial that Arcilla could step in and provide these services, we question why Arcilla would not simply treat JL Minerals like any other landowner who needed kaolin to be mined and agree to a royalty rate producing a fraction of what Dr. Capps estimated.

We could go on (and make similar observations about Messrs. Hayter's, Spears's, and Kenny's analyses). That is the point: Use of the discounted cashflow method with so few reliable inputs and so many

**[*65]** variables and unknowns is simply an exercise in imagination. As such it is altogether unreliable, and we would ignore the laughable results it generated even if we thought mining were the easement property's highest and best use. We caution taxpayers in the future who choose to use this method without strong support that we will view the income approach and the discounted cashflow method with skepticism, particularly in the conservation easement context.

### 3.    *Valuation Conclusion*

On the record before us, we find that the easement property had a before value of $2,700 per acre, in light of the actual sales of the easement property as well as Mr. Sheppard's persuasive analysis of sales of comparable properties. The total before value of the property accordingly is $174,690 ($2,700 × 64.7 acres). Mr. Sheppard found the lowest "after value," concluding that the easement property was worth $81,000 after the granting of the easement. As this value is more favorable to JL Minerals than the one its own experts determined, we will treat this as a concession by the Commissioner.

The fair market value of the conservation easement accordingly is $93,690 ($174,690 − $81,000) at the time JL Minerals contributed the conservation easement to Heritage.

## V.    *Deduction-Related Expenses*

In addition to adjusting the charitable contribution, the IRS disallowed $227,534 in "other" deductions JL Minerals claimed on its 2017 tax return. The parties agree that the amount at issue is actually $228,913.

Beasley Timber asserts that all of the enumerated expenses were incurred in connection with "investigating the values of the property and documenting the conservation easement contribution." It posits that the amounts were deductible either under (1) section 165(a) as a loss stemming from the abandonment of certain of its rights in the easement property or (2) section 212(3) as expenses incurred as part of its reporting of the charitable contribution deduction.

Neither provision fits. As an initial matter, Beasley Timber fails to show that a donation of rights for which a charitable contribution deduction has been claimed under section 170 can double as a loss for section 165(a) purposes. And the text of section 212 limits the claimant of that deduction to "an individual," which plainly excludes a limited

[*66] liability company such as JL Minerals. *See, e.g.*, Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 20.1.1 (3d ed. 1999).[20]

VI.    *Section 6662 Accuracy-Related Penalties*

The Commissioner determined accuracy-related penalties under section 6662 with respect to both the charitable contribution deduction and the other deductions JL Minerals claimed. We conclude that the 40% gross valuation misstatement penalty under section 6662(h) applies to JL Minerals with respect to the former deduction. We likewise find that the 20% penalty applies with respect to the other deductions, either on negligence or substantial understatement grounds.[21]

A.    *Governing Principles*

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty on the "underpayment of tax required to be shown on a return . . . equal to 20 percent of the portion of the underpayment to which this section applies" upon a taxpayer who underpays its tax because of, among other things, "[n]egligence or disregard of rules or regulations," a "substantial understatement of income tax," or a "substantial valuation misstatement." An understatement of income tax is substantial if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or $5,000. I.R.C. § 6662(d)(1)(A). For 2017, the year at issue, a substantial valuation misstatement exists if "the value of any property . . . claimed on any return . . . is 150 percent or more of the amount determined to be the correct amount of such valuation." I.R.C. § 6662(e)(1)(A). None of these penalties will be imposed where the taxpayer had "reasonable cause."

---

[20] We recognize that businesses often can deduct expenses under section 162 that an individual might deduct under section 212. Beasley Timber makes no argument that the expenses are deductible under section 162 and has accordingly forfeited such an argument. *See, e.g.*, *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (stating an appellant who fails to argue an issue in his brief abandons it); *Rowen v. Commissioner*, 156 T.C. 101, 115–16 (2021) (explaining that a "litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace" (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))); *Estate of Spizzirri v. Commissioner*, T.C. Memo. 2023-25, at *17 n.9 ("The [taxpayer] has failed to develop this argument and, consequently, has forfeited the issue.").

[21] The Commissioner has conceded the reportable transaction understatement penalty under section 6662A asserted in the FPAA.

[*67] I.R.C. § 6664(c)(1). *But see* I.R.C. § 6664(c)(3) (imposing heightened requirements for a substantial valuation overstatement).

One possible ground for claiming "reasonable cause" is reliance on professional advice. Treas. Reg. § 1.6664-4(b). "If a taxpayer alleges reliance on the advice of a tax professional, that 'advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" *Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, at *29 (quoting *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), *aff'g* T.C. Memo. 2004-279); *see also Gustashaw v. Commissioner*, 696 F.3d 1124, 1139 (11th Cir. 2012), *aff'g* T.C. Memo. 2011-195. "Advice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1382 (Fed. Cir. 2010). "A taxpayer advancing a reliance-on-professional-advice defense must also show that it actually relied in good faith on the advice it received." *Oakhill Woods*, T.C. Memo. 2020-24, at *29; *see also Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

In the case of a "gross valuation misstatement"—i.e., where the value of property claimed on the return is 200% or more of the amount determined to be the correct valuation—the rate of the accuracy-related penalty is increased to 40%, I.R.C. § 6662(h)(1) and (2)(A)(i), and no "reasonable cause" defense is available, I.R.C. § 6664(c)(3).[22]

### B. *Charitable Contribution Deduction*

JL Minerals claimed on its partnership return a charitable contribution deduction of $16,745,000 for its donation of the easement. We have determined that the correct value of the easement at yearend 2017 was no greater than $93,690. JL Minerals therefore overstated on its return the value of the easement by much more than 200%, and the

---

[22] Generally, only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is penalizable on more than one of the grounds set forth in section 6662(b). Our jurisdiction in a TEFRA proceeding, as here, extends to the determination of partnership items and the applicability of any penalty that relates to an adjustment to a partnership item. I.R.C. §§ 6221, 6226; *United States v. Woods*, 571 U.S. 31, 39–42 (2013). "There is thus no limitation on our ability to determine *the applicability* of more than one accuracy-related penalty at the partnership level." *Oconee*, T.C. Memo. 2024-73, at *3; *see also Mill Road*, T.C. Memo. 2023-129, at *70.

**[\*68]** 40% penalty under section 6662(h) for a gross valuation misstatement applies. *See* I.R.C. § 6662(e)(1)(A), (h)(2)(A)(i).[23]

C. *Other Deductions*

The FPAA asserted accuracy-related penalties with respect to the other deductions based on substantial understatement and negligence. *See* I.R.C. § 6662(a) and (b)(1) and (2).

As to a substantial understatement, any understatement of income tax attributable to the disallowance of the $228,913 of other deductions that is substantial (i.e., any understatement that "exceeds the greater of—(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000"), I.R.C. § 6662(d)(1)(A), is subject to penalty at the 20% rate. Beasley Timber does not argue that JL Minerals had reasonable cause with respect to this penalty.

We hold in the alternative, and to the extent that the understatement for any partner attributable to the other deductions is small enough that it does not count as "substantial," that the underpayment is attributable to negligence. "Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances." *Mill Road*, T.C. Memo. 2023-129, at \*70 (citing *Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 123 (2009), *aff'd*, 613 F.3d 1360 (11th Cir. 2010)). It "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1). Negligence also "includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." *Id.*

As we have explained, JL Minerals failed to identify proper grounds for its deduction, pointing to plainly inapplicable provisions. In any event, the record before us shows that several of the expenses underlying the catchall deduction were reported for the wrong year and most of the other expenses lack substantiation. Beasley Timber fails to

---

[23] Since we have sustained the Commissioner's imposition of the 40% gross valuation misstatement penalty against JL Minerals (while allowing a charitable contribution deduction of $93,690), it is not necessary to address whether the alternative penalties for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement should be imposed.

**[\*69]** argue that it had reasonable cause on this point, and so we find the penalty applicable.

VII.    *Conclusion*

Throughout trial and briefing, Beasley Timber has maintained that JL Minerals did nothing more than respond to the incentive offered by Congress to encourage conservation.  To be fair, "[t]he issues before us are influenced by a gentle tension between a defined public policy of favoring, for the public good, perpetual conservation easements and the strict requirements imposed on taxpayers when claiming charitable deductions for granting such easements." *Brooks v. Commissioner*, 109 F.4th 205, 222 (4th Cir. 2024), *aff'g* T.C. Memo. 2022-122.

The value of the deduction claimed in this case, however, "does not pass any reasonable smell test." *Id.*  JL Minerals and its coterie of advisors took Congress's attempt to promote conservation and cynically used it as a cover to fleece the public fisc to the tune of nearly $17 million in baseless deductions.  The fault lies not in Congress's action, but in JL Minerals itself.

To reflect the foregoing,

*Decision will be entered under Rule 155.*